L STEWART, J.
The Louisiana Department of Social Services (“DSS”) appeals a judgment of the Monroe City Court denying a petition to terminate the parental rights of L.S., the mother of the minor child, L.R.S. The court found that DSS failed to prove the elements for termination of parental rights under La. Ch. C. art. 1015(5) by clear and convincing evidence. For the reasons stat *1043 ed in this opinion, we reverse the judgment and order termination of the parental rights of the mother, L.S.
FACTS
Records introduced into evidence at the hearing on the petition for termination of parental rights detailed L.S.’s' long history of mental illness and involvement with the foster care system. L.S. was in state custody from the ages of 6 to 18, with placements in foster homes, group homes, and treatment facilities. At the age of 14, L.S. was raped by the adult son of a foster parent and gave birth to a child, who was also placed into state custody and adopted after L.S.’s parental rights were terminated.
Due to her mental illness, L.S. has had numerous hospitalizations since 1991. Her most recent diagnoses have included Major Depressive Disorder and Borderline Personality Disorder. Anger, paranoia, and depression result from her illness. She has poor coping skills and becomes easily overwhelmed and agitated. Her anger has manifested itself through self-mutilation, suicidal ideation, and suicide attempts generally involving overdoses of medication. L.S. was hospitalized at least six times in the three months preceding the birth of L.R.S.
| ¡.L.R.S. was born on April 28, 2002. Following the birth, the Office of Community Services (“OCS”) in Ouachita Parish opened a Family Services case on L.S. and arranged for Homemaker’s Assistance for her. However, on May 20, 2002, OCS received a report that L.S. had overdosed on medication while home alone with the baby. An OCS worker went to L.S.’s home and arranged for her to be hospitalized after L.S. stated that she had taken 10 pills each of Zoloft and Haldol to relax. By instanter order of May 22, 2002, L.R.S. was placed in state custody due to the report of neglect. Thereafter, L.R.S. was adjudicated- a child in need of care and placed in a certified foster home.
The court approved a case plan for reunification developed by the family team conference and appointed a CASA volunteer, as authorized by La. Ch. C. art. 424, to represent the best interests of the child.[1] Goals established by the case plan required L.S. to cooperate with OCS, maintain adequate income, maintain a permanent home free from drugs, alcohol, violence and safety hazards, maintain contact with L.R.S. and take responsibility for appropriate parenting, locate L.R.S.’s father, and identify her mental illness as a contributing factor for the neglect of L.R.S. and take steps to change her patterns.
The case plan assessment of November 2002, stated that L.S. was doing her best to complete the case plan, but that her mental ■ instability was the main problem preventing reunification. Efforts to find a suitable | ¡¡placement for L.R.S. with relatives whose names were submitted by L.S. were unsuccessful. , On November 15, 2002, the court again approved a case plan for reunification.
By the May 2003 case plan assessment, the goal had been changed to termination of parental rights for L.S. and adoption for L.R.S. The assessment noted that while L.S. made some progress on the case plan, she made little progress toward diminishing the main barrier to reunification — her mental instability. Since L.R.S. had been placed in state custody, L.S. had been hospitalized 9 times for episodes related to *1044 her mental instability. Episodes which occasioned L.S.’s psychiatric hospitalizations included overdosing on medication, cutting herself, and threatening to harm herself or others. OCS had some difficulty verifying L.S.’s hospitalizations and mental health treatment as she had refused to sign consent forms for release of her information. L.S. had maintained her SSI income, but she had some difficulty establishing a permanent residence as she moved in with different relatives, lost housing in one program due to a suicide attempt, and lost an apartment due to a fire that was not her fault. In addition, L.S. had not successfully completed parenting classes and had not demonstrated anything she learned from the classes during visits with L.R.S. Both CASA and Dr. Bobby Stephenson, the psychologist who evaluated L.S., recommended termination of parental rights.
On May 22, 2003, one year after L.R.S. had been taken into custody, DSS filed a petition for termination of parental rights under La. Ch. C. art. 1015(5). The termination proceedings took place on August 27, 2003, LNovember 15, 2003, and November 17, 2003.[2] The court denied termination of L.S.’s parental rights in an oral ruling on November 19, 2003. The court’s reasons were set forth in a written judgment signed on February 9, 2004, as follows:
These records indicated some of her admissions for psychiatric treatment were voluntary in nature, as she felt paranoid and was not taking her medicines. Then, with the most recent admission, on July 24, 2003, a Physician’s Emergency Certifícate was issued, with some violence on her part and unwillingness to seek help. A five (5) day stay then ensued, with a diagnosis on Axis 1 of Major Depression. Then, she seemed much improved. Both Drs. Stephenson, PhD, and Dr. Agarwal, MD, expressed concern about her ability to care for a child at this time.
The Case Plans were reviewed, including her compliance and cooperation with DSS, along with her progress. Her major problem has been mental instability. While there has not been 100% compliance, (L.S.) has been moving in that direction. She recognizes and has sought help on her own at times. Since she seeks help, she should not be punished. Her cooperation with DSS case plans include obtaining SSI, a place to live and is now working part-time as part of her treatment plan with Harmony House, a day treatment program for disabled persons.
Thus, the Court finds she has made significant measurable progress. Looking at her history, she had numerous hospitalizations in 2001 and 2002, but only three (3) thus far in 2003. However, both doctors (supra) expressed concern and reservations with her present ability to care for a child. The next area to examine is the “reasonable expectation” of change in the “foreseeable future,” and again both doctors said they needed the mother ... to be free from hospitalizations for one to two (1 to 2) years. This court cites In re: Ardoin, 667 So.2d 1144 (La.App. 3d Cir.1995)[sic] where “reasonable foreseeable future” was found by the Court to be a number of years in the foreseeable future.
The court ordered more frequent visits between L.S. and L.R.S. and ordered that the goal be changed to reunification. This appeal by DSS followed.
*1045 | .DISCUSSION

Applicable Law

The state’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the state seeks the permanent severance of that relationship in an "involuntary termination proceeding: The fundamental purpose of such a proceeding is to provide the greatest possible protection to a child whose parents are unable or unwilling to provide adequate rearing and care for his physical, emotional, and mental health needs. To this end, the proceeding provides an expeditious judicial process for termination of parental rights in order to achieve permanency and stability for the child. State in the Interest of S.M.W., 2000-3277 (La.2/21/01), 781 So.2d 1223; State in the Interest of J.A., 1999-2905 (La.1/12/00), 752 So.2d 806.
The court in an involuntary termination proceeding must balance the interests of the child and the parents. While the parents have a natural, fundamental liberty interest in the continuing companionship, care, custody, and management of their children, the child has a profound interest, often at odds with the interests of the parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental. care; In, balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parents. State in the Interest of J.A., 752 So.2d at 810-811 (citations omitted.)
In addition, the passage of the Adoption and Safe Families Act (ASFA), 42 U.S.C. § 601, et seq., by Congress in 1997, and the legislature’s amendment of several provisions of Louisiana Children’s Code tilted the delicate balance between the competing interests of the parents and child in the child’s favor. State in the Interest of S.N.W. v. Mitchell, 2001-2128 (La.11/28/01), 800 So.2d 809. As stated in La. Ch. C. art. 1001, Comments—1999(b), “ASFA requires states to articulate the principle that ensuring a child’s health and safety is the paramount concern in departmental" and judicial decisionmaking.” As such, the primary concern of the courts and the state is to secure thé best interests of the child, including termination of parental rights if justifiable grounds exist and are proven. State in the Interest of S.N.W., supra; State in the Interest of S.M.W., supra.
DSS sought termination of L.S.’s parental rights under the grounds set forth in La. Ch. C. art. 1015(5) as follows:
(5)Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
The state bears the burden of proving the grounds for termination by clear and convincing evidence. La. Ch. C. art: 1035(A). Even when this evidentiary burden is met, a court should not terminate parental rights unless termination is found to be in the child’s best interest. State in the Interest of J.M., J.P.M. and M.M., 2002-2089 (La.1/28/03), 837 So.2d 1247.

Standard of Review

The manifest error standard of review applies to a trial court’s findings as *1046 to whether parental rights should be terminated. State in the Interest of K.G. and T.G., 2002-2886, 2002-2892 (La.3/18/03), 841 So.2d 759. A court of appeal may not set aside a trial court’s factual findings in the absence of manifest error or unless such findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). However, where one or more legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court conducts its own independent de novo review of the record. Evans v. Lungrin, 1997-0541 (La.2/6/98), 708 So.2d 731. Legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial, that is when they materially affect the outcome and deprive a party of substantial rights. Id.
DSS argues that the trial court erred in applying the standard of “foreseeable future” previously used in La. Ch. C. art. 1015(5), rather than “near future,” in determining whether there was a reasonable expectation of significant improvement in L.S.’s condition or conduct and in concluding that the “reasonable foreseeable future” is “a number of years in the foreseeable future.” In its oral ruling, the trial court found a lack of clear and convincing evidence that “there’s no foreseeable future where she [L.S.] will not be able to re ... [sic] take care of her child.”
| RStatutory interpretation is a function of the judicial branch of government. Theriot v. Midland Risk Ins. Co., 95-2895 (La.5/20/97), 694 So.2d 184. However, the fundamental consideration in statutory interpretation is ascertaining the legislative intent through legislative history and related legislation. Id. “Where a new statute is worded differently from the preceding statute, the legislature is presumed to have intended to change the law.” State in the Interest of DM., 2003-2754 (La.1/30/04), 865 So.2d 45, 46, citing Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885, 888.
Acts 1997, No. 256 rewrote La. Ch. C. art. 1015(5). As explained in Comments 1997(e), former Articles 1015(4) and (5) were the sources for the new provision. These two former provisions, Article 1015(4)(c) and (5)(b), required proof of “no reasonable expectation of his reformation inthe foreseeable future.” (Emphasis added.) As amended, La. Ch. C. art. 1015(5) now requires proof of “no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future.... ” (Emphasis added.) In amending La. Ch. C. art. 1015(5), the legislature changed the “foreseeable future” standard to that of “near future” for assessing the reasonable expectation of significant improvement by a parent whose rights are subject to termination. Amendments by Acts 1997, No. 256 and Acts 1999, No. 449 also added the component requiring consideration of the “child’s age and his need for a safe, stable, and permanent home” in assessing the reasonable expectation of significant improvement by the parent in the near future. La. Ch. C. art. 1015(5).
1 pAlthough the legislative history of Acts 1997 does not lend much guidance as to the legislative intent behind the amendments to La. Ch. C. art. 1015(5), the change from “foreseeable future” to “near future” is discussed in the Louisiana Children’s Code Handbook as follows:
(c) Reasonable expectation of significant improvement in the parent’s condition or conduct in the near future: A' deliberate and significant shift in public policy is apparent when comparing the current language with that of the predecessor statute which required a finding that parental reformation was unlikely in the “foreseeable future.” See former Arts. 1015(3)(b), 1015(4)(c), and *1047 1015(5)(b). “Foreseeability” is quite expansive and could warrant a denial of termination in cases such as, a heroin addict who was beginning treatment but whose addiction and impairment could stretch on for five, six, or even ten years. The more limiting term, “near future”, is now used and that calculation is to be taken from the child’s perspective of time. Three years to an adult is a relatively brief span of time; three years to a three-year-old is an entire life or half a lifetime after the lapse of three additional years.... This principle is in accord with jurisprudence recognizing the permanent harm that can result from lengthy delays in decisionmaking before a permanent, stable home is achieved for the child.
(Citations omitted.) McGough and Triche, Louisiana Children’s Code Handbook, 2001 Authors’ Notes on Art. 1015(5)(c), p. 486 (Thomson West, 2004 Ed.).
When La. Ch. C. art. 1015(5) is asserted as the grounds for termination, one year has already elapsed since removal of the child from his parents’ custody by court order. The parents have had this same period of time to work on achieving the goals of the case plan and improving the condition or conduct that led to removal of the child from their custody. The distinction drawn by the authors of the Handbook between the expansiveness of what may occur in the “foreseeable future” and the limited time period suggested by the “near future” insures that the child will |innot be left to linger in foster care or state custody indefinitely. The distinction serves the paramount consideration in termination proceedings — the best interests of the child — by requiring courts to assess the likelihood of improvement in the parent’s condition or conduct in a time frame that places a premium on securing permanency, stability, and safety for the child. We recognize that the decisions in a termination proceeding are factually intensive and tailored to the individual circumstances of each case. As such, a bright-line rule defining “near future” is not realistic. However, as a general principle, waiting a “number of years” in the future for parents to improve the conditions or conduct that led to removal of their child from their custody does not serve the best interests of the child, particularly the need to establish a safe, secure, and permanent home. Assessment of whether there is a reasonable expectation of significant improvement in the parent’s condition in the near future should be made in light of the purposes stated in La. Ch. C. art. 1001, particularly that the “proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for the children.”
We find it was legal error for the trial court to assess the reasonable expectation of improvement in L.S.’s condition or conduct in terms of the foreseeable future standard. This error skewed the factual findings and materially affected the outcome of the proceedings. For these reasons, de novo review of the record is necessary to determine whether DSS met the burden of proving grounds for termination by clear and convincing evidence.
| nDe Novo Review
Lori Traweek, an OCS child welfare supervisor who served as L.S.’s case manager since May 2002, and who participated in the family team conferences and in formulating the case plan for L.S., testified about L.S.’s compliance with the case plan. While L.S. succeeded in maintaining her SSI income, she had less success in obtaining a permanent home. L.S. lived with different relatives and then lost housing because of a suicide attempt. Traweek could not conclude that L.S.’s home was free from violence due to her problems with anger and mental instability. Addressing L.S.’s cooperation with OCS, *1048 Traweek stated that L.S. was not always forthcoming about her hospitalizations and had refused to sign waivers for release of medical information, which were necessary to allow OCS to assess L.S.’s progress. In fact, Traweek pointed to L.S.’s mental instability, which manifested itself in her noncompliance with medication and frequent hospitalizations due to self-mutilation and suicide attempts, as the main reason for seeking termination. Traweek testified that mental health treatment was a key component of the case plan. She opined that the 10 hospitalizations that had occurred since L.R.S. was taken into custody established the lack of improvement-in L.S.’s mental instability.
Traweek also believed that L.S. had not made progress in her parenting skills. Initially, L.S. was allowed weekly visits with her daughter, but once the goal changed to termination, the visits were decreased to twice a month. Traweek observed at least 20 visits. She observed that L.S. had difficulty comforting L.R.S. when she cried. The foster mother would 1! ¿model behavior for L.S. to follow; however, L.S. was not always successful in implementing the behaviors and would become frustrated when the baby would not cooperate. L.S. brought gifts for the baby- and would play with her. However, there was not much verbal interaction by L.S. with the baby. Tráweek expressed concern about L.S.’s ability to remain calm and to provide L.R.S. with parenting at different developmental stages. Though she admitted that there had been some progress on L.S.’s part, Traweek cautioned that things had not progressed to the point of L.S. interacting well with her child on a consistent basis. Traweek revealed that L.S. generally had a good relationship with the foster mother but that L.S. had threatened to kill.all those involved with L.R.S. during a disagreement in January 2003.
Service providers who worked with L.S. on her parenting skills also testified. Jacqueline Garrison began working with L.S. in July 2002 at Family Matters on a weekly basis to address two areas — counseling and parenting skills. Counseling was not successful. L.S. continued to inflict harm on herself as evidenced by hospitalizations in September 2002, December 2002, and January 2003. Garrison observed 8 to 10 visits by L.S. with L.R.S. and concluded that L.S. did not show any improvement in her parenting ability. She noted that L.S. did not seem to understand that the baby needed to be held and given attention; rather, L.S. seemed to .feel that the foster mother was spoiling L.R.S. Noting the suicide attempts made by L.S., Garrison believed that the pressure of a child in the home would only add to L.S.’s problems and that L.S. would not be able to provide a safe environment for a child. Garrison closed L.S.’s case on January 29, 2003, I Tsfor lack of progress. She testified that L.S. was becoming dependent on her and was not really trying to address her problems.
Kim Barkley of Volunteers of America testified that L.S. voluntarily sought parenting classes in May 2003. She testified that L.S. made a sincere effort to learn and that she was able to answer questions about the class. Barkley observed two visits and believed L.S. acted appropriately. However, Barkley testified that she would need more than the visits she observed' to say whether L.S. could implement everything covered in class.
L.S. received services through the Monroe Area Guidance Center, a psycho-social rehabilitation agency for persons with serious mental illnesses. Billie Berringer, a clinical manager, testified that L.S. had been regularly receiving services since July 2002, and that she attends Harmony House, a day hospital, on an almost daily *1049 basis. Berringer believed there was some improvement during L.S.’s participation at Harmony House as L.S. had fewer episodes of acting out. Patsy Stegall, a counselor at Harmony House, had recently been assigned to L.S.’s case. Although Stegall testified that there had been some improvement in L.S., she conceded that she had not been working with L.S. long enough to say whether L.S. could parent on a daily basis. Nancy Pruitt, an associate clinical manager, worked with L.S. since April 1, 2003, and had daily contact with her. Pruitt noted that L.S. had been in her current residence for about four months, that she was working part-time in the Support Employment Assistance Program at Harmony House, and that her goal was to obtain a GED. Pruitt also testified that L.S. is sometimes in denial about 114her problems and that this affects her receptiveness to services. At the time of the hearing, L.S. had been taking her medication regularly for about a month or month and a half, but there had been periods of non-compliance when incidents had occurred. According to Pruitt, L.S. is making progress but she still experiences “rough days” where she gets angry and frustrated. Pruitt also testified that since April 2003, L.S. had expressed suicidal ideation more than 10 times. Pruitt cited stress tolerance as a real problem for L.S. and expressed concern that having a child in the home would be hard on L.S. Pruitt testified that L.S. could not adequately care for L.R.S. if placed in her home at this time. Most importantly, Pruitt could not say whether L.S. would ever progress to the point of being able to care for her child.
L.S. was evaluated on July 26, 2002, and April 4, 2003, by Dr. Bobby Stephenson, a psychologist. Stephenson testified that L.S. made minimal effort during the first evaluation at which she appeared angry, frustrated, and resentful of OCS’s involvement. However, L.S. put forth more effort on the second evaluation. Stephenson cited anger as L.S.’s primary problem. He noted a history of abusive relationships, anger, and depression. His diagnosis included mood disorder and major depression with possible bipolar trends. Stephenson explained that episodes of suicidal ideation and self-mutilation indicate the anger and frustration felt by L.S. He attributed some of her anger to past trauma and some to her temperament. Although he noted that L.S. has hurt only herself in - the past, he expressed some concern about how her anger and impulsiveness might affect a child in her [1Bcare. He noted that although L.S. had undergone a lot of counseling, she had not been successful in making her anger go away. Stephenson had “significant reservations” about whether L.S. could care for a child. He would need to see at least a year of stability without hospitalizations or violent episodes before he would feel it was safe to have a child in her care. He noted the problems that L.S. had in complying with her medication regimen and expressed concern that any problem, even stress from a child in her care, might set her off on the same pattern of instability. While noting that L.S. might improve over time with continued counseling and medication, Stephenson opined that waiting for this improvement would not serve the child’s best interest, which he stated to be adoption. He believed that it was time to move on and that the child should not continue waiting for L.S. to achieve stability.
Dr. Rita Agarwal, a psychiatrist, began treating L.S. in 2000 for recurrent' self-mutilation and overdoses. Her diagnosis of L.S. was borderline personality disorder and depressive disorder. She explained that this causes L.S. to be unstable, irritable, and easily angered. Agarwal testified that she expected no change in L.S.’s diagnosis in the near future and could ■ not predict how much improvement L.S. might make with continued treatment. Her *1050 prognosis for improvement was very guarded. Though she testified that L.S. was motivated by the desire to get her child back and seemed to be doing -better with fewer instances of self-mutilation and fewer hospitalizations during 2003, she cautioned that L.S. could immediately -fall apart at any setback. Agarwal explained that L.S.’s intense 11fianger, dysphoria, and difficulty relating to others would make it difficult for her to care for her child. When asked about the possibility of L.S. being able to care for her child in the future, Agarwal answered “maybe” with supervision. One to two years of stability without suicide attempts or cutting herself would be necessary for Agarwal to consider that L.S. might be doing better.
Medical records introduced into evidence established that L.S. had been hospitalized 10 times since L.R.S. was removed from her custody. Her most recent admission was at Glenwood .Behavioral Health Unit in July 2003. Records show that she was paranoid and threatening to harm herself and others. Her conduct required the use of restraints during part of her stay in the hospital. She was hospitalized in April 2003 at E.A. Conway Medical Center when she threatened to overdose and cut her arm, which required 18 staples. She was also hospitalized in January 2003 due to her anger and threats to harm the persons caring for L.R.S. The records on these and L.S.’s other hospitalizations demonstrate the seriousness of her condition and the difficulties she has dealing with her anger and handling stress in her life.
• L.S.’s testimony showed her desire to regain custody of her child and the steps she has taken to comply with the case plan. Her testimony also showed that she has some denial about the seriousness of her mental illness and the impact it has on her life and her ability to regain custody of L.R.S. Notwithstanding her lengthy history of mental illness, L.S. attributed all the problems she has had since removal of L.R.S. from her custody to stress |17from the ongoing court proceedings. She denied having any need for counseling and described herself as straight and happy.
Mental illness alone is insufficient grounds to warrant termination of parental rights. However, the parent’s mental state as it relates to the ability to care for the child is an important factor to be considered in a termination proceeding. State in the Interest of J.A., supra; State in the Interest of 35,588 (La.App.2d Cir.10/31/01), 799 So.2d 1178. Under La. Ch. C. art. 1036(C)(6) and (7), proof of lack of parental compliance with a case plan is evidenced by the “parent’s lack of substantial improvement in redressing the problems preventing reunification” and the “persistence of conditions that led to removal or similar potentially harmful conditions.” Under La. Ch. C. art. 1036(D), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be shown by the following:.
(1) Any physical or mental illness ... that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or ... an established pattern of behavior. * * *
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based on expert opinion or .... an established pattern of behavior.
L.S. should be applauded for positive steps she has taken to maintain an income, establish a residence, and work part-time. Her love for L.R.S. was demonstrated by her regular attendance at visits. However, we do not find that *1051 there has been substantial compliance with the case plan. L.S.’s |ismental instability, the reason for removal of L.R.S. from her custody, remains a persistent problem affecting her ability to function as a parent and even to function on her own. Her history is replete with instances of hospitalizations, suicidal ideation, self-mutilation, and disturbances requiring police intervention, all of which evidence the persistent mental illness that has not shown any signs of real improvement. The numerous hospitalizations and need for almost daily supervision at Harmony House demonstrate the high level of care that her illness requires.
L.S.’s condition impairs her ability to handle stress, control her anger, and relate to others. An additional concern expressed at trial was the effect on L.S. of the added stress of caring for a child on a daily basis. None of the experts who testified believed L.S. to be capable of parenting her child, and none of them testified that she will be likely to do so in the near future. Although Dr. Stephenson and Dr. Agarwal testified that they might find L.S.’s condition improved after one to two years of stability with no hospitalizations, suicide attempts, or angry outbursts, neither doctor testified that this outcome is likely to be achieved. The guarded prognosis for improvement in L.S.’s condition sometime in the future is not a sufficient basis to find a reasonable expectation of significant improvement in L.S.’s condition or conduct in the near future, considering L.R.S.’s young age and need for a safe, stable, and permanent home.
From our de novo review of the entire record, we find that DSS proved the grounds for termination under La. Ch. C. art. 1015(5) by clear and convincing evidence. Had we reviewed the record under the manifest 119error standard, our conclusion would have been the same. The trial court’s findings are not supported by the record. The record establishes L.S.’s lack of substantial compliance with the case plan and the lack of a reasonable expectation of significant improvement in her condition in the near future.
Finally, we find termination of parental rights to be in L.R.S.’s best interest. L.R.S. has been with her foster mother since shortly after her birth. The record establishes the strong bond that has developed between L.R.S. and her foster mother who desires to adopt her. Dr. Stephenson testified that termination of parental rights and adoption would be in L.R.S.’s best interest and that the child should not wait any longer for L.S. to achieve stability. We agree that L.R.S.’s need for permanency, stability, and safety will not be met by prolonging her time in foster care while awaiting the possibility of improvement in L.S.’s condition. For these reasons, termination of parental rights is appropriate.
CONCLUSION
For the reasons stated in this opinion, we hereby reverse the judgment of the trial court and render judgment terminating the parental rights of L.S. Based on the facts and evidence of record, we conclude that DSS has satisfied its burden under La. Ch. C. art. 1015(5) and that termination of parental rights is in the best interest of the minor child, L.R.S. This matter is remanded to the Monroe City Court for further expedited proceedings consistent with this opinion.
REVERSED AND REMANDED.
APPLICATION FOR REHEARING
Before STEWART, GASKINS, PEATROSS, DREW and MOORE, JJ.
Rehearing denied.

. Although OCS believed the case met the requirements for immediate pursuit of termination of L.S.’s parental rights since her rights to her first child had been terminated previously, see La. Ch. C. art. 1015(3)(k), they determined during the family team conference to first work toward the goal of family reunification.

. The father of L.R.S. stipulated to the termination of his parental rights during the proceedings.