BROWN, Chief Judge.
hThe mother of four minor children appeals from the decision of the Caddo Parish juvenile court that irrevocably dissolved and terminated her parental rights and freed her four children for adoption. Parental rights of any known and unknown biological fathers of the children were likewise terminated. Although they did not appeal or answer, DAC, Sr., father of two of the children, together with IE, father of one child, filed a joint brief adopting the mother’s argument. For the reasons set forth below, we affirm the trial court’s decision.

Facts

In December 2008, the Department of Children and Family Services (“DCFS”) received a report concerning the mother and her four children. At that time, ASW was six years old, WRW was four years old, DAC, Jr. was two years old, and JMW was seventeen months old. The report indicated that the mother had recently been hospitalized for depression; she refused to take her prescribed medications; she would lock herself in the bathroom of her home for hours at a time leaving her children unattended; and the two-year old child would run outside unsupervised. Furthermore, the report stated that the mother had dreamed that she was going to kill her four-year-old son, DAC, Jr. Earlier that year, she had been admitted into the psychiatric unit of the former LSUHSC after she was found walking down a street nude and experiencing hallucinations.
Upon her initial visit, the child protection investigator, Kimberly Holmes, found the mother’s house to be covered in dirty clothes, trash, and what appeared to be feces smeared on the walls of the children’s bedroom. l2The children were taken into State custody in January 2009. During the course of Ms. Holmes’ subsequent visits, the mother’s condition improved. Her home was kept cleaner and contained food for the children to eat, and the children were clean upon arriving at school. As a result of the overall improvements, the children were returned to their mother’s care in March 2009. The DCFS family services program offered her housing, assistance, daycare, and mental heath treatment.
In March 2009, DCFS attempted to provide the mother with a psychological evaluation by the LSUHSC Psychiatric Department in order to determine whether she needed mental health services. The mother failed to attend the scheduled appointment. Shortly thereafter she was referred to the court because of an allegation of “lack of supervision” due to her potential mental health issues and an inability to raise her children. In an affidavit in support of an instanter order filed on April, 1, 2009, DCFS investigator, Russell Waller, stated that WRW related in an interview that although it had not happened lately, his mother had hit him in the past with curtain rods, belts, sticks, and other items. WRW and ASW both claimed that their mother spoke to people who were not there. An instanter order was signed on April 1, 2009, ordering the removal of the *1195 children from the mother’s custody. On May 21, 2009, the children were adjudicated in need of care.
During the following months, the mother made an effort to address some of her issues by attending counseling with her children and attempting to find suitable housing. However, she was again hospitalized for a month |3from January 2010-February 2010. After being in the custody of the state for almost 16 months, the children were returned to her custody on July 27, 2010, under DCFS’s supervision.
However, by September 2010, the mother’s mental health again deteriorated, and she begin missing therapy appointments for both herself and ASW. The children arrived at school appearing dirty and smelling of urine often to the extent that they had to change once they arrived at school. The mother failed to administer the ADHD medication to WRW as prescribed by his physician. JMW, who was a four-year-old at the time, was reportedly walking to school by himself. The mother failed to appear at the September 21, 2010, court hearing, at which the judge ordered the return of the children into foster care.
On November 24, 2010, custody of WRW was granted to his father, IE. However, within six months, IE relinquished custody of his son, citing behavioral issues. The father testified at trial that he has had no contact with his son since November 2011. On May 4, 2011, after the permanency review, custody of WRW and ASW was granted to the maternal grandparents. Unfortunately, the grandparents relinquished custody of the children back to DCFS and stated that they did not wish to have custody of any of the children in the future. ASW and WRW were returned to foster care in separate homes. DAC, Jr., and JMW remained in the same foster home together. All of the children were demonstrating significant behavior problems.
|4Over the course of the next two years, the mother continued the same patterns of unpredictable behavior. She neglected her mental health appointments and failed to take her medications consistently. The mother often scheduled her mental health appointments on the eve of court hearings. She consistently made excuses for not taking her medications. She was admitted again to Brentwood Hospital in November 2012 for treatment of her bipolar disorder after experiencing visual hallucinations of people and shadows approaching her.
The mother’s consistency in maintaining visitation with her children was regular for periods and then would suddenly cease for a month at a time. Her mental health interfered with her ability to comply with the court-approved rehabilitation plan. The mother would go weeks without utilities and water services in her apartment.
DAC, Jr.’s biological father and JMW’s alleged father, DAC, Sr., is currently incarcerated at the East Carroll Detention Center with an expected release date of December 3, 2015. He was incarcerated briefly in 2009 and then again in 2010.
Ultimately, DCFS filed an action on August 22, 2013, to terminate the parental rights of AW, as well as the children’s fathers. At this time, the children were 12, 11, 8, and 7 years old. DCFS has been involved for approximately six years and the children have been placed in foster care for four years.
The juvenile court in Caddo Parish held hearings on October 24, 2013, and November 4, 2013, and found by clear and convincing evidence |fithe necessary grounds for terminating the parental rights of AW to all four children, the parental rights of DAC, Sr. to the minor children DAC, Jr., *1196 and JMW, as well as the parental rights of IE to WRW.
The trial court’s judgment was signed on January 6, 2014. The instant appeal was filed by the mother in this court on February 26, 2014.[1]

Discussion

Parents have a liberty interest protected by due process in establishing and maintaining a meaningful relationship with their children; however, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in Interest of B.J., 48,857 (La.App.2d Cir.01/15/14), 135 So.3d 777; State in the Interest of A.C., 93-1125 (La.1/27/94), 643 So.2d 719, cert, denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995). Whether a termination of parental rights is warranted is a question of fact, and a trial court’s determination will not be set aside in the absence of manifest error. State ex reí. H.A.B., 10-1111 (La.10/19/10), 49 So.3d 345; State in the Interest ofB.J., supra.
Louisiana Children’s Code article 1015 provides grounds by which a court may involuntarily terminate the rights of parents. State ex reí. H.A.B., supra. DCFS sought termination of the mother’s parental rights under La. Ch. C. art. 1015(5), alleging that the children had been removed from their mother’s care for longer than one year, that there was no substantial compliance with an approved case plan, and that there was no reasonable expectation of significant improvement in the mother’s condition in the near | (¡future, and that termination of the parental rights was in the children’s best interest.
La. Ch. C. art. 1036(D) enumerates the one or more conditions in which the lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced. These include:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
Before a state may sever completely and irrevocably the rights of parents in their natural child, due process requires that the state support its allegations by at least clear and convincing evidence. A “clear and convincing evidence” standard adequately conveys to the fact finder the level of subjective certainty about his factual conclusions necessary to satisfy due process. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
The four children were originally entered into DCFS care pursuant to an oral instanter order issued on April 1, 2009. The children have remained in and out of foster care for over four years, which exceeds the one-year time period delineated by La. Ch. C. art. 1015(5).
*1197 |7The mother briefly regained custody of the children on two separate occasions after the initial time that DCFS took custody. The children were initially returned to their mother in February 2009, after she agreed to participate in a voluntary family services program offered through DCFS that offered housing, daycare services, referral to mental health treatment and assistance in applying for LaChip and food stamps for the children. Unfortunately, efforts to maintain the placement of the children with their mother were short lived. Her mental health again deteriorated prompting DCFS to request custody of the children on April 1, 2009. Ultimately, the children were adjudicated in need of care on May 21, 2009.
Following a psychiatric hospitalization in January 2010-February 2010, the mother’s condition begin to stabilize and DCFS attempted, for a second time, to grant her custody of the children on July 27, 2010. However, this placement lasted for less than 60 days. It was reported that then four-year-old JMW was walking to school by himself, and that the mother was failing to administer WRW his ADHD medication. According to reports, she missed her therapy appointments with ASW, who was going to school in dirty clothing and would often wash and change into clean clothes at school. The mother failed to appear at the September 21, 2010, hearing and the judge ordered that the children be placed in state custody at that time due to neglect.
The state presented evidence showing the mother’s lack of compliance with the DCFS agency case plan. The mother argues on appeal that the case plan centered around her obtaining mental health treatment and Dthat mental illness or disability alone is insufficient grounds to terminate parental rights. State ex. reí. L.R.S., 38,-812 (La.App.2d Cir.06/23/04), 877 So.2d 1040.; State in Interest of C.V.W., 48,166 (La.App.2d Cir.04/10/13), 113 So.3d 1202. However, the courts have found that it is important to consider in a termination proceeding the parent’s mental health as it relates to her ability to care for her children. State ex reí. L.R.S., supra; State in Interest of C.V.W., supra.
One component of the mother’s case plan was that she receive mental health counseling and follow the recommendations from her mental health evaluation which included taking her prescribed medications. The record shows that she did not completely ignore her mental health and did seek sporadic treatment at LSUHSC, Brentwood Behavioral Health Center, and Shreveport Behavioral Health Center. She was intermittently hospitalized in psychiatric hospitals since at least 2008. The mother has been prescribed Geodon, Ziprasidone, Benzatropine, Lithium Carbonate, Trazodone, Trileptal, and Abilify during this period. DCFS’s case plan review records indicate a history of the mother’s noncompliance in taking her medication and attending regular counseling appointments. In the trial transcript, she gave the court excuses as to why she was noncompliant with her medication requirements. One reason she gave was her inability to afford a certain medication prescribed; however, Shreveport Mental Health Center reported to DCFS that she never came to pick up the prescription, and that the center would have never prescribed her a medication that was unaffordable.
| sAlthough the case plan identifies an objective addressing the mother’s mental health treatment, the plan clearly set out other critical objectives as well. The case plan required the mother to receive train-' ing to teach her proper parenting skills, classes which she failed to attend. She was also required to attend all family visits *1198 with her children and hearings set by the trial court. Although the mother did attend some of the family meetings, the caseworker, Crystal Smith, testified at trial that there were two to three times when the mother missed visits for a month at a time.
Also, the case plan required the mother to keep the case worker informed of her circumstances and update her contact information. The case plan evaluation states that the mother often failed to comply with this requirement. For instance, she stated to the case worker that she has gainful employment; however, she refused to reveal the place of her employment. The mother has also gone months at a time without contacting DCFS. She claims that her phone was disconnected.
The state has an obligation to make a reasonable effort to preserve the family. If such measures fail, the state is required by law to make reasonable efforts to place a child for adoption or with a legal guardian. State ex reí A.T., 06-0501 (La.07/06/06), 936 So.2d 79. The subsequent placements of the children with their mother after DCFS initially took custody is evidence that the mother was given an adequate opportunity to cooperate with the case plan and attempt to improve the conditions that ultimately led to her children’s permanent removal from her home. Although the mother did take steps toward completing her case plan, such |10as seeking some medical treatment and attending family counseling sessions with her children, we do not find that these attempts constitute substantial compliance with her case plan.
The trial court found that there is no reasonable expectation of significant improvement in the mother’s conduct. The trial court considered evidence of the mother’s lack of compliance with her case plan. The case plan required a myriad of action steps for her to comply with prior to receiving full custody of her children, and she failed to fully cooperate. As a result, we concur with the finding of the lower court that, based on clear and convincing evidence, there was no reasonable expectation that the mother would significantly improve in her condition in the near future.
The second issue raised by the mother is the court erred in finding that termination of her parental rights was in the best interest of her four minor children.
The state need only establish one ground under La. Ch. C. art. 1015 and prove the elements by clear and convincing evidence. The judge must also find that the termination is in the best interest of the child. La. Ch. C. art. 1039. State in Interest ofB.J., supra; State in Interest of C.V.W., supra. The court held in State in the Interest ofB.J. and P.W., supra at 782, that:
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing, by providing an expeditious judicial process for terminating all parental rights and responsibilities and luachieving permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child *1199 for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest of the child, including termination of parental rights if justifiable grounds exist and are
The trial court found in this case that it is in the best interest of the children that they be given the opportunity for permanency, which has not been bestowed upon them by their mother or fathers. There are not many circumstances as detrimental to a child’s development as uncertainty as to where he or she shall remain. State ex reí H.A.B., supra.
In the case sub judice, the evidence is clear that the mother’s parental rights are outweighed by the children’s need for permanency, which their mother has shown to be incapable of providing. There is no evidence that her ability to care for her children has improved since DCFS became involved in the case over four years ago. DAC, Jr., and JMW have resided in the same placement together since being taken out of their mother’s home. Although their foster parent is uncertain as to whether she will attempt to legally adopt them, she has stated that she certainly wants to keep them indefinitely. At the time of trial, WRW was in pre-adoptive placement. Although he struggles with behavioral issues, he is reportedly doing well with his current placement. ASW has exhibited mental health issues for which she has been hospitalized. She has received consistent medical treatment at her current placement, which is imperative to her best interest. It is doubtful that her mother would be successful in providing consistent medical care to her child since she is incapable of doing so for |12herself. For the reasons mentioned above, the lower court did not err in finding that the best interest of the children will be served by termination of the mother’s paternal rights and certification of these children for adoption.

Conclusion

The judgment of the juvenile court is affirmed.

. Her appeal was untimely. However, as there was some confusion about notice and given the nature of the case, this court has decided to hear the appeal.