1GASKINS, J.
The mother of seven children appeals from the termination of her parental rights to three of her children. We affirm.
FACTS
D.M.D.B. is the mother of seven children. In State ex rel. S.D. v. D.M.D.B., 36,406 (La.App. 2d Cir.8/14/02), 823 So.2d 1113, this court affirmed the adjudication of the six oldest children as children in need of care. The mother’s seventh child has never been in state custody and his care was not an issue. We also affirmed the goals of permanent placement with relatives for the three oldest children, as well as the goals of adoption for the younger three children who were in state custo *420 dy. The present appeal concerns the termination of the mother’s rights to these three younger children in order to free them for adoption. They are: C.E.C. (DOB 7/19/95); M.D.B. (DOB 2/27/98); and S.J.B. (DOB 4/16/00).
C.E.C. first entered the state’s custody in September 1995 when he and his three older siblings were removed from their mother’s care due to lack of supervision. C.E.C., then a seven-week-old infant, was hospitalized with a fractured skull because of physical abuse by his legal father, who pled guilty to attempted manslaughter.[1] The four children were returned to their mother in December 1995, and the Department of Social Services (DSS) began offering services.
M.D.B. was born in February 1998. In December 1998, the mother’s five children were removed from her care again. At this time, C.E.C. was three years old and M.D.B. was 10 months old. In late 1999, the children | awere returned to their mother’s custody again and DSS supervision ended in January 2000.
S.J.B. was born in April 2000. In October 2000, the mother was arrested for leaving her six children at home alone. The children were placed in the legal custody of the state due to lack of supervision. In December 2000, a trial placement of the children back with their mother was ordered but the state retained legal custody. The mother called the case manager on March 6, 2001, and told her to pick up the children. However, C.E.C. was returned to his mother’s custody on March 30, 2001, in an apparent attempt to secure reinstatement to the mother of the disabled child’s SSI benefits so she would have an income. DSS placed the five other children with her on a trial basis but retained their legal custody.
It was discovered that in May and June 2001 that the mother had been leaving the children alone again. The trial placement was terminated and the children returned to state custody. C.E.C.’s legal custody was again returned to the state. The state began looking into other permanent placement alternatives. The three oldest children were placed with paternal relatives. In early 2002, the court granted guardianship of the three oldest children to the paternal relatives with whom they had been placed. In the meantime, the mother gave birth to her seventh child in November 2001.
In February 2002, the state filed a petition to terminate the rights of the parents of the three children involved in the instant appeal. The parental rights of the children’s legal and biological fathers were terminated by stipulation and/or after hearings.
IsTrial on termination of the mother’s parental rights was held over several court dates beginning in May 2004 and concluding in October 2004, at which time the matter was taken under advisement. In November 2004, the court issued written reasons for judgment. It noted the mother’s established “pattern of progression and regression.” The court acknowledged that over the years the mother had made some efforts to comply with case plans. She had obtained her GED, a job readiness work certificate and a retail/sales diploma, completed parenting classes and a business management course, and enrolled at ULM. She had occasionally been employed. However, she was also inconsistent in complying with regular visitation, a major component provided for in the various case plans. Since May 2003, she attended only about 50% of these scheduled *421 visits. While some absences were due to legitimate work reasons, the majority were unexplained or for reasons deemed by the court to be unacceptable. The court also noted that the mother had inadequately prepared herself to meet C.E.C.’s medical needs, failed to actively involve herself in her children’s educational needs, and failed to make adequate child care arrangements.
The trial court also considered the testimony of psychologist Dr. Bobby Stephenson who opined that the mother was capable but unwilling to accept her parental responsibility. He recommended termination of her parental rights.
The trial court found that the state had proved by clear and convincing evidence that the interest of the children would be best served |4by terminating the mother’s parental rights. It was not convinced that the mother had reached the level where she could implement and integrate the progress she had made into a “behavior of acceptable parental skills and responsibilities.” The court noted her failure to substantially comply with the many case plans and found that there was “no reasonable expectation of significant improvement within the near future.” Furthermore, the court concluded that the “children’s right to a safe, secure and permanent home can no longer be delayed.” Judgment was signed on March 17, 2005.
The mother appeals.
TERMINATION OF PARENTAL RIGHTS

Law

La. Ch. C. art. 1015 provides, in relevant part:
The grounds for termination of parental rights are:
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
Among the factors to be considered in determining lack of parental compliance with a case plan are the parent’s failure to attend court-approved scheduled visitations with the child, the parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan, and the parent’s lack of substantial improvement in |firedressing the problems preventing reunification. See La. Ch. C. art. 1036(C).
Lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior. La. Ch. C. art. 1036(D)(3).
In order to terminate parental rights, the court must find that the state has established at least one of the statutory grounds contained in La. Ch. C. art. 1015 by clear and convincing evidence. La. Ch. C. art. 1035. Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child’s best interests. See La. Ch. C. art. 1037(B).
*422 The issue of parental compliance with a case plan, the parent’s expected success of rehabilitation, and the expectation of significant improvement in the parent’s condition and conduct are questions of fact in a proceeding for termination of parental rights. State ex rel. A.R.H. v. Hines, 35,800 (La.App. 2d Cir.2/27/02), 810 So.2d 1166. An appellate court cannot set aside a trial court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. Hines, supra.
Children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best |fiinterests of the child. State ex rel. J.M., 2002-2089 (La.1/28/03), 837 So.2d 1247.

Prematurity

We note at the outset that the mother contends that the petition to terminate her parental rights as to C.E.C. was premature. However, under the provisions of La. Ch. C. art. 1015(5), the court has the discretion to consider the termination of the mother’s rights with respect to C.E.C. even though his most recent removal from the mother’s custody was less than a year prior to the filing of the petition to terminate. State ex rel. E.E.M., 1999-1458 (La.App. 1st Cir.9/24/99), 754 So.2d 1028. Furthermore, we observe that C.E.C.— who is now 10 years old — has been in and out of state custody since he was only seven weeks old.

Discussion

Dr. Stephenson testified about his evaluations of the mother and the two older children, C.E.C. and M.D.B. The psychologist saw the mother on several occasions; based upon his observations, he recommended that the children be freed for adoption. While he felt that she had the ability to parent, he stated that she had not and that she did not seem able to make the commitment to do the things required of her. He felt that her personality style — which includes anger, hostility, irritability, and inability to make commitment — was such that this would not change significantly in the foreseeable future. He saw difficulty in her ability to consistently care for the children. He was particularly wary of her ability to provide the level of day-to-day care required for a child with C.E.C.’s problems.
^According to Dr. Stephenson, C.E.C. has an IQ of only 47, which is in the moderately mentally handicapped range; he has significant learning problems and indications of neurological impairment. When he was eight years old, he had the mental development of a four-year-old. Because mental development does not continue to accelerate after age 18, Dr. Stephenson opined that after age 18, C.E.C. would only function at the level of an eight to ten-year-old. The child requires frequent medical appointments and takes medication; according to his clinical social worker, C.E.C. has been diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder. Given the boy’s fearfulness, impulsiveness and lack of control, Dr. Stephenson believed that he needed permanence and stability.
Dr. Stephenson also saw M.D.B. on three occasions. She has an IQ of 89, which is within the low average range. The last time he saw her was in 2003 when she was five years old. Her responses indicated that she had been around a “fair amount” of violence and that she had been exposed to sexual activity. She also displayed a degree of distrust and suspicion. Dr. Stephenson testified that the girl needed a greater degree of safety, security and permanence. He felt it would be in her best interest to be freed for adoption.
*423 Phyllis Taylor, a licensed professional counselor who began treating M.D.B. when she was about three years old, believed that she had been either sexually abused or very near people engaging in sexual activity. The girl indicated that this happened while at the mother’s home. Ms. Taylor |salso recounted that the girl had a “good bit of fearfulness” associated with living with the mother.[2] According to Ms. Taylor, M.D.B. did not have a strong bond with the mother; however, she is closely bonded to her foster mother, who has expressed an interest in adopting her.
A foster mother who began caring for S.J.B. at the age of 15 months testified that the girl had developmental delays in speech and language. When she received the child, S.J.B. could walk but not talk. She also had emotional problems and was very fearful.
Andrea Savage, a family guide from Family Matters, worked with the mother on parenting classes in 1999. Although the mother was attentive and intelligent, Ms. Savage found that she was unable to actually implement the material covered. While the mother was able to keep her home “spotless” when the children were not living there, the residence was filthy when they were there. Ms. Savage also noted that the children were not always dressed appropriately. The mother’s case was closed in January 2000 due to lack of progress.
Tamara Thompson of Family Connections/Family Matters testified that they opened a case file on the mother in early 2001 and closed it in February 2002 when they had exhausted all the resources they could offer her. She said that the mother never took responsibility for the children being in state care. Due to this inability and the birth of the mother’s seventh child, she opposed returning the children to the mother.
19Elizabeth Johnson of the Volunteers of America testified that the mother attended parenting classes at her organization in 2002 and had perfect attendance. She referred the mother to Early Childhood Support and Services for professional counseling.
Melanie Clark, a licensed professional counselor at the YWCA, testified that she talked to the mother in 2003 about her “destructive” relationships with men and her grief over her mother’s death. The mother failed to attend the majority of her scheduled appointments.
Dr. Tina Malone, a supervised psychologist at Early Childhood Support and Services, testified that her organization was currently providing services to the mother and her youngest child. She testified that the mother was receptive to counseling. However, the mother’s ability to keep a job was a concern. Also, she had no information about the mother’s other children and their needs.
The state presented the testimony of several DSS workers who recounted the mother’s most recent history with that agency. As correctly characterized by the trial court, the mother had a “pattern of progression and regression.” Janice Madison was a crisis investigator called to the mother’s residence in October 2000. The mother had left her six children home alone while she went to an Even Start class; the oldest child was only 10 years old. The mother was arrested, and the children were removed. Gretchen Broad- *424 nax was the ease manager from October 2000 to March 2001. The children were returned to the mother for trial placement in December 2000 against the agency’s recommendation. According to Ms. Broadnax, the |inmother’s utilities were constantly on and off, and her housekeeping skills were “terrible.” The home was filthy, and the children slept on mattresses on the floor, most without linens. When Ms. Broadnax tried to obtain beds for the children, she was unable to do so because the mother had almost exhausted the maximum amount that could be spent on a client for furniture. The children were briefly removed from the mother’s care at the mother’s request.
Nancy Joiner first dealt with the mother in 1995 when C.E.C. and his older siblings first came into state care. She was the case manager from March 2001 until August 2001. According to her, the children were returned to the mother in March 2001 with the mother having legal custody of C.E.C. so that she could receive an income from his SSI check. She described the children as living in filth at the mother’s home; the utilities were off part of the time during the spring and summer. The mother failed to keep the children’s medical appointments or pick up their prescriptions. The children were removed in June 2001 after Ms. Joiner discovered that the children were being left alone again. When asked for the children’s clothes, the mother refused to give the clothing to Ms. Joiner and told her to buy new clothes.[3]
Debra Sherrill was the case manager from August 2001 to April 2002. She testified that the mother’s level of cooperation was minimal and her only compliance with the case plan was attending visitations. She said the Inonly time the mother ever really talked to her was to “yell” at her about the agency. The next case manager was Julia Clark. She worked to find resources for the mother. It took almost a year, from April 2002 to the end of March 2003, before she could get the mother to agree to go to mental health counseling. She contacted the YWCA to obtain anger management, domestic violence and sexual abuse counseling for the mother; in five months, the mother attended only three sessions. The mother told Ms. Clark that she was involved with Early Childhood Support and Services; however, she refused to sign a consent form to allow the agency to obtain her records. In March 2003 the mother became employed through the Manpower Program, but this job lasted only until June 2003. The mother blamed the job loss on the amount of time she had to miss work for family visits and other appointments the state required her to attend. However, Ms. Clark testified that the Manpower Program records indicated that not all of the mother’s absences were attributable to these matters.
Since Ms. Clark felt the mother was making some progress in January 2003, she tried to accommodate her desire for more visitation with the children. However, the mother began missing visits; from May 2003 to October 2003, she attended four but missed eight visits. Although she claimed that she missed them due to work, she continued to miss the visits even after the job ended in June 2003. Her pattern of missing visits or failing to call in advance continued.
The mother testified that she was attending college and was going to become a registered nurse. She planned to support *425 herself with grants and haloans. She said that she worked occasionally for a catering business. She stated that she had a fian-cé; although he was unemployed, they planned to get married and buy a house.[4]
The mother contended that the state’s witnesses were untruthful in their testimony. Among other things, she asserted that she sought out counseling at the YWCA on her own without the agency’s assistance. She claimed that the agency bought clothes that were not needed. She gave a myriad of excuses for not attending visitations or calling to say that she was not going to attend; among these were that she was in Texas and calling would have been long distance or that the visits were distressing to her. She testified that her sister and a neighbor currently helped her care for her youngest child when necessary and that if the other children were returned to her she could obtain child care assistance from a neighbor. However, the frailty of these arrangements was shown in court when the proceedings were interrupted by the mother’s youngest child. She had to bring him to court with her because her sister had just had a baby of her own and the child refused to stay with the neighbor.
The mother complains that she was undermined in her efforts to maintain custody of her children during one of the trial placements because she did not receive C.E.C.’s SSI check for several months when she had the children. By the time the problem was corrected, the children had been returned to foster care. She contended that, had she had this income, the children would not have been returned to foster care. The mother’s failure |1sto receive the check apparently became a substantial issue between her and the social workers on her case. However, we note that the children were taken from the mother on several occasions when she was receiving the check. Also, there was testimony that the mother rebuffed efforts by Ms. Sherrill to take her to the Social Security office to rectify the problem. According to this case manager, the mother was more concerned about not receiving the check than working on the case plan.
The mother argues that the fact that her seventh child has never been removed from her care by the state shows that she is now able to resume custody of the three children at issue here. When questioned about the mother’s ability to successfully care for her youngest child, Dr. Stephenson said it could be attributable to the fact that there is only one child, the child’s young age, or the fact that she knows the state is still involved with her. He also noted that he had no information on how well this child was functioning. According to Dr. Malone, this child has some developmental delays. She also stated that she had frequently visited the mother’s house while she had only the youngest child and that the home was usually clean. This was in sharp contrast to the squalor described by case workers who visited the home when the mother had custody of all of the children, with food, trash, and piles of clothing on the floor. They described a chaotic situation wherein an older sibling, not the mother, bore the primary responsibility for caring for and feeding the younger children.
While the mother may be able to adequately care for her youngest child, the record demonstrates severe failings in her ability to care for |14multiple older children. Of greatest concern is C.E.C.; the record indicates that properly caring for this child, who has many special needs, is *426 an arduous undertaking beyond the mother’s still limited ability. We also note with concern the information in the record indicating that one of the daughters was exposed to sexual activity or was sexually abused while in the mother’s care. The mother contends that, to her knowledge, the girl has never been molested.
While the mother has finally complied with some aspects of the case plan by receiving counseling and successfully completing courses which are of educational and financial benefit, we share the trial court’s profound reservations about her abilities. Whether the mother will ever be able to actually incorporate the information she has obtained into successful parenting is unknown. The three children at issue in this appeal have languished in foster care long enough. Their great need for security and stability is of paramount importance and their best interests must be placed above that of the mother.
Based on the record before us, we cannot say that the trial court was manifestly erroneous or clearly wrong in finding that there has been no substantial compliance by the mother and there is no reasonable expectation of significant improvement in the mother’s conduct in the near future. The record shows that it is in the best interest of the children for the mother’s parental rights to be terminated and for the children to be freed for adoption.
| ^CONCLUSION
The judgment of the trial court terminating the parental rights of the mother, D.M.D.B., to the minor children, C.E.C., M.D.B., and S.J.B., is affirmed.
Costs of this appeal are assessed to the appellant.
AFFIRMED.

. As a result of this abuse, C.E.C. has permanent impairment and receives Supplemental Security Income (SSI) benefits from the Social Security Administration.

. The counselor was able to discern a profound difference in the girl’s behavior when she was returned to her mother’s care at one point. The first time she saw the girl she was in foster care; she was happy and talkative. When she saw her the next time after she had been returned to her mother, the child was fearful and had significantly regressed.

. According to Ms. Broadnax, when a child enters foster care, $300 of clothes are purchased for tire child. This had to be done at least three times for the mother's children because the mother refused to release the clothing when the children were returned to foster care.

. Although the mother testified in August 2004 that she planned to get married and buy a house, she admitted in October 2004 that she had made no advances toward either goal.