PEATROSS, J.
hA.N.B. appeals from a judgment terminating her parental rights to her minor child, J.J.B., and freeing the child for adoption. For the reasons stated herein, we affirm.

FACTS

The minor child, J.J.B., was first removed by instanter order from the custody of his mother, A.N.B., and taken into the care and custody of the state on April 25, 2007, following a report of neglect, malnourishment and abandonment.[1] J.J.B. was physically removed from the care of A.N.B.’s relatives as she had left J.J.B. with them and had not returned. J.J.B. was three years old at that time and was suffering from severe dental neglect and was being cared for by various individuals and relatives other than A.N.B. J.J.B. was then placed in the care and temporary custody of his maternal cousin. Following the continued custody hearing, the child was adjudicated in need of care on the bases of abandonment, medical neglect, malnutrition and inadequate clothing.
In June 2007, physical custody of J.J.B. was transferred to his maternal uncle because the cousin was unable to become certified for kinship care and, therefore, could no longer provide care for J.J.B. The following February, however, a second instanter order was issued removing J.J.B. from the custody of his uncle because of unexplained injuries suffered by the child. The record reflects that the girlfriend of the uncle, who also resided in the home with the uncle and J.J.B., related information to case | gworkers beginning in October 2007 concerning alleged “clumsiness” of J.J.B. and his propensity to fall down and *375 injure himself. At the request of the case worker, the girlfriend took J.J.B. to the hospital, where he presented with a hema-toma to the posterior occipital area, a he-matoma in his left eye (a blackened eye), an abrasion and laceration to his face and trauma to the left hand with severe swelling and pain. J.J.B. also exhibited several older hematomas, abrasions and scars on his back. The uncle and girlfriend provided differing accounts of how J.J.B. sustained the injuries. The record includes medical testimony that the blackened eye was the result of blunt force trauma. The record also reveals that the child exhibited no clumsiness or propensity to fall down while at school. The medical testimony excluded any possible medical condition of J.J.B. that may result in reduced gross motor skills increasing his tendency to fall. To the contrary, the testimony indicates that J.J.B. is active and has good motor skills and coordination, consistent with his age and development. Accordingly, on December 8, 2008, J.J.B. was again determined to be in need of care and was placed in the custody of the state and in a foster home.
From the initial removal of J.J.B. until February 2009, the goal of the Department of Social Services (“Department”) was reunification with the mother. The record reveals that numerous case plans were formulated for A.N.B.; however, she refused to comply with the requirements of those plans and was uncooperative with case workers. A.N.B. was not attending visitations with J.J.B. as provided in the case plans. A.N.B. was to have visitations with J.J.B. every other week, but the sole contact between A.N.B. |Rand the child was a “chance” meeting in a Family Dollar store on July 10, 2008.
At a permanency hearing on February 9, 2009, the court approved a change in goal from reunification to adoption and advised A.N.B. that the next step would be the filing of a petition to terminate her parental rights. There was testimony at the permanency hearing that A.N.B. was not cooperating with the Department and would only speak with the CASA volunteer. A.N.B. had not secured housing for herself and J.J.B. and had failed to begin substance abuse treatment. The testimony further indicates that A.N.B. had given birth in March to an infant who tested positive for ecstasy and marijuana.
Subsequently, the Department filed a Petition For Termination of Parental Rights on June 23, 2009, and the matter was heard on August 10, 2009. After hearing the testimony, the trial judge terminated the parental rights of A.N.B. to J.J.B., finding that the Department had met its burden of proof by clear and convincing evidence. Specifically, he found that A.N.B. “failed to work her court approved ease plan and make substantial progress in correcting the parenting deficiencies addressed in the court approved case plan.” The trial judge found no reasonable expectation of improvement and that A.N.B. and the unknown father of J.J.B. had abandoned the child by having no physical contact with the child and by failing to provide financial support for the child. The trial judge further found it to be in the best interest of J.J.B. that he be freed for adoption so that he may be placed in a |4“safe, stable and nurturing” permanent home. This appeal by A.N.B. ensued.

DISCUSSION

Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights. Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. State ex reí. A.T., 06- *376 0501 (La.7/6/06), 936 So.2d 79; State ex rel. C.M.M. v. T.P.M., 42,238 (La.App.2d Cir.5/9/07), 957 So.2d 330; State ex rel. A.D.W., 43,012 (La.App.2d Cir.1/9/08), 974 So.2d 137.
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children. These interests warrant great deference and require full, vigilant due process protection ensuring that fair procedure is followed when the state seeks to terminate the parent-child legal relationship. Balanced against those protections is the child’s profound interest in terminating parental rights which prevent adoption and hamper the establishment of secure, stable, long-term and continuous relationships found in a home with proper parental care. In balancing the parents’ and the child’s interests, the courts of this state have consistently found the interests of the child to be paramount over those of the parents. State ex rel. C.M.M. v. T.P.M., supra, citing State ex rel. L.B. v. G.B.B., 02-1715 (La.12/4/02), 831 So.2d 918.
|sThe fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the state remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. State ex rel. S.M.W., 00-3277 (La.2/21/01), 781 So.2d 1223; State ex rel. C.M.M. v. T.P.M., supra.
Although there are several statutory grounds for involuntary termination of parental rights set forth in La. Ch. C. art. 1015, as stated, only one ground need be established. State ex rel. S.C.M., 43,441 (La.App.2d Cir.6/4/08), 986 So.2d 875; State ex rel. J.W.M., 44,513 (La.App.2d Cir.6/24/09), 15 So.3d 1218. According to La. Ch. C. art. 1015(4),(5) and (6), the grounds for termination of parental rights include:
(4) Abandonment of the child by placing him in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child’s parent continue to be unknown.
|fi(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s *377 custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch. C. art. 1085(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); State ex rel. C.M.M. v. T.P.M., supra. Even upon finding that the state has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child’s best interest. State ex rel. C.E.C. v. D.M.D.B., 40,409 (La.App.2d Cir.9/28/05), 912 So.2d 418; State ex rel. C.M.M. v. T.P.M., supra.
La. Ch. C. art. 1036, which addresses proof of parental misconduct, provides in pertinent part:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
|7(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
[[Image here]]
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
The state must prove that the parent is unfit to retain parental control and that there is no reasonable expectation of reformation in the foreseeable future in order to obtain termination of parental rights when the child has | sbeen removed from the parent’s home. State ex rel. B.H. v. A.H., 42,864 (La.App.2d Cir.10/24/07), 968 So.2d 881.
*378 The issue of parental compliance with a case plan, the parent’s expected success of rehabilitation and the expectation of significant improvement in the parent’s condition and conduct are questions of fact in a proceeding for termination of parental rights. An appellate court cannot set aside a trial court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. State ex rel. C.E.C. v. D.M.D.B., supra; State ex rel. S.S.S., 39,047 (La.App.2d Cir.8/18/04), 880 So.2d 153; State ex rel. C.M.M. v. T.P.M., supra.
Children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child. State ex rel. C.E.C. v. D.M.D.B., supra; State ex rel. C.M.M. v. T.P.M., supra; State ex rel. A.D.W., supra.
In the case sub judiee, the Department asserted La. Ch. C. art. 1015(4) and (5) as the bases for termination of A.N.B.’s parental rights. As previously stated, the trial judge ordered that A.N.B.’s parental rights be terminated and certified J.J.B. for adoption. On appeal, A.N.B. argues that the termination of her parental rights to J.J.B. is not supported by clear and convincing evidence. A.N.B. submits that she did not abandon J.J.B. and asserts that the judgment was clearly and manifestly erroneous because she was meeting “some of the goals of her care plan in light of the prevailing |neconomic conditions in this country.” We disagree with A.N.B. and detect no manifest error in the findings of the trial judge.
At the hearing on termination of parental rights, A.N.B. testified as follows:
Q: Is it correct, [A.N.B.], that case plans were formulated for your reunification with the child with the agency and court approved?
A. Yes, sir.
Q: Is it correct, [A.N.B], that the last time-contact you had with your son, [J.J.B.], was on or about July 10, 2008, at a convenience store?
A: Yeah.
Q: Is it correct that you have not had any contact with your son from that day to present date?
A: No, sir.
Q: Is it also correct, [A.N.B.], that since the time that your child came into care, you have not provided any financial support for the child, your child?
A: No, sir.
THE COURT: Is it correct or is it not correct?
A: Uh yeah.
THE COURT: It’s correct.
A: Yes, sir.
Q: And you have also not communicated with your child by means of the telephone, letter, or any type of written communication, is that correct?
A: Yes, sir.
[[Image here]]
ImQ: Now, why haven’t you communicated with the child? Why haven’t you called or talked to the child?
A: I don’t know.
Q: I can’t hear you.
A: I don’t know sir.
Q: Have you tried to?
A: Huh.
Q: Have you tried to?
A: I had seen him once at Family Dollar Store. I had seen him once.
*379 Do you know the child s telephone number? G?
No, sir. t>
Did you ask anybody for it? <©
No, sir. i>
Why didn’t you want to have the child’s telephone number? <©
Huh? i>
Why didn’t you want to have the number? Why didn’t you want to have the number? <©
(inaudible.) i>
Ma’am? <©
I don’t know. i>
A.N.B. admits in the remainder of her testimony that she refused to work with the Department because she believed that case workers had disclosed confidential information to her family. The testimony makes clear, however, that A.N.B. took no steps toward the goal of reunification |nwith J.J.B. In addition, although A.N.B. had been employed as a housekeeper at a motel for a little over a month at the time of the hearing, she had historically failed to maintain any employment and had not had housing since J.J.B. was removed in 2007. Case worker Mary Ann Gilfoil testified that A.N.B. was requested to obtain employment and housing and to complete substance abuse treatment several times during 2008 and 2009, but failed to do so. Ms. Gilfoil further explained the change in goals from reunification to adoption:
... [A.N.B’s] last contact with [J.J.B.] was July 10th, of '08, when [J.J.B.] and the foster mother ran into [A.N.B.] at the Family Dollar Store here in Tallulah and since that time, [A.N.B.] has not visited with [J.J.B.] nor has she submitted any type of birthday present or birthday card[2] or Christmas present. And I have had two contacts with A.N.B. within the last week and a half and in those two contacts, [A.N.B.] has not asked about [J.J.B.] welfare.
The record is replete with examples of A.N.B.’s refusal to cooperate with the Department in its efforts to reunite her with her child. We find no error in the trial court’s determination that the Department met its burden of proof by clear and convincing evidence that A.N.B. abandoned this child and failed to comply with the case plan. We further detect no manifest error in the determination that it is in the best interest of J.J.B. to be certified for adoption. The record reveals that J.J.B. is thriving in the foster home. He is doing well in school and his emotional, medical and financial needs are being met. Ms. Gilfoil testified that the only anxiety observed in J.J.B. is when the state van arrives to take him for a visitation with A.N.B. The [,..record supports the decision that this child now deserves stability and permanence and should be free for adoption.

CONCLUSION

For the foregoing reasons, the judgment of the trial court terminating the parental rights of A.N.B. to her minor child, J.J.B., and freeing the child for adoption is affirmed. Costs of appeal are assessed to the mother, A.N.B.
AFFIRMED.

. The biological father of J.J.B. is unknown. Paternity testing excluded the candidate provided by A.N.B. In addition, the Department of Social Services received information that the maternal uncle with whom J.J.B. was placed in June 2007 may have been the father; however, he was also excluded by DNA testing.

. J.J.B. s birthday is July 30, just a few weeks after he saw his mother in the Family Dollar Store,