LOLLEY, J.
11The defendant, C.L., appeals the judgment of the 2nd Judicial District Court, Parish of Jackson, State of Louisiana, terminating her parental rights as to her minor children, J.L. and A.L. For the following reasons, we affirm the trial court’s judgment.
Facts
In September 2008, the Louisiana Department of Children and Family Services (the “Department”) received and validated a report of Dependency by G.L. regarding her child, J.L., born February 16, 2007. A family services case was opened by the Department in order to provide services to C.L. and avoid removal of the child. On March 11, 2009, C.L. gave birth to her second child, A.L., who was born with a congenital heart condition and clubbed feet. C.L. moved to Jonesboro, Louisiana with her mother. Ultimately, A.L. was hospitalized at New Orleans Children’s Hospital for failure to thrive and began to gain weight after a feeding tube was surgically implanted.
In June 2009, A.L. was removed from C.L.’s custody, because it was believed that C.L. could not adequately care for the child. A.L. was adjudicated a Child in Need of Care by stipulation on July 8, 2009.
In August 2009, C.L. reported to the Department that her food stamp case had been closed, and she had no food. The Department conducted an inspection of her home — C.L. and J.L. were not home, but her mother, Sherry Gough, showed the Department case worker the home. The case worker discovered not only was there a lack of food, but the home was unsanitary and disorganized. The case worker observed dog feces in the living area | ^and in C.L.’s bedroom. The home was littered with cigarette butts, clothes, and other household items. The case worker told Gough that the home would need to be cleaned, and she and C.L. were given one week to do so. When the case worker returned the next week, the house was cleaner, but there was no substantial food in the house, only popsicles. The Department was informed that J.L. was staying with his “godparents,” John White and Susanne Gatlin, because there was no food in the home. After running a background check on White and Gatlin, the Department learned that Gatlin had a significant history with the Department.
*449 On August 14, 2009, J.L. was removed from C.L.’s custody and placed in the state’s custody due to the concern that she could not adequately care for the child. On September 9, 2009, J.L. was adjudicated a Child in Need of Care by stipulation, and in October 2009, the children’s cases were consolidated.
In October 2009, J.L.’s father executed a voluntary act of surrender regarding his parental rights, which was approved by the trial court. In September 2010, A.L.’s father executed a voluntary act of surrender regarding his parental rights, which was also approved by the trial court.
Initially, the trial court approved a case plan with a goal of reunification of the children with their mother. However, after several case plans, in October 2010, the Department filed its Petition for Termination of Parental Rights and Certification of Minor Children for Adoption. In that petition, the Department alleged that:
13* C.L. had failed to substantially comply with her case plans;
• C.L. was unable to demonstrate substantial improvement in redressing the problems preventing reunification after receiving services;
• the Department did not foresee any reasonable expectation of significant improvement in C.L.’s conduct or condition; and
• C.L. failed to provide significant contributions to the care and support of the children during the time they were in the custody of the Department, nor did she have significant contact with them by visits or communications.
At the May 4, 2011 Permanency Hearing, the trial court approved a change of the goal from reunification to adoption of the children, although C.L. was still receiving services.
The termination of parental rights hearing was conducted in September 2011, and after hearing evidence on the matter, the trial court took the case under advisement. Up until that point, the trial court had considered and approved five case plans for the care of the children and services to C.L. A judgment was entered subsequently terminating C.L.’s parental rights to her children, J.L. and A.L., freeing the children for adoption. This appeal by C.L. ensued.
Discussion
On appeal, C.L. raises one assignment of error, arguing generally that the trial court erred in terminating her parental rights as to J.L. and A.L. Specifically, C.L. submits that the trial court was in error in its judgment for |4three reasons: (1) she was unable to provide significant contributions to her children’s care and support, because she is indigent; (2) there was no evidence that she failed to maintain contact with the children for six consecutive months; and (3) there was insufficient evidence that she failed to substantially comply with the Department’s case plan. In this case, we find that the Department proved by clear and convincing evidence that C.L. had failed to substantially comply with the Department’s case plan, meeting the requirement of proving at least one of the statutory grounds for termination under La. Ch. C. art. 1015.
A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children, including the companionship, care and custody of the children. State in the Interest of A.C., 1993-1125 (La.01/27/94), 643 So.2d 719, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995); State ex rel. S.C.M., 43,441 (La.App.2d Cir.06/04/08), 986 So.2d 875. The fundamental purpose of involuntary termination proceedings is the protec *450 tion of a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs by providing an expeditious judicial process to terminate parental rights and to achieve stability for the child. The primary concern of the courts and the state is to secure the best interest of the child, including termination of parental rights if justifiable grounds exist and are proven. State ex rel. R.L.T. and S.A.T., 45,168 (La.App.2d Cir.01/27/10), 30 So.3d 1085.
|5To terminate parental rights, the state must meet the onerous burden of proving one of the statutory grounds for termination set forth in La. Ch. C. art. 1015 by clear and convincing evidence. La. Ch. C. art. 1035(A); State ex rel. B.H. v. A.H., 42,864 (La.App.2d Cir.10/24/07), 968 So.2d 881. Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence. State in Interest of K.D., 586 So.2d 692 (La.App. 2d Cir.1991). Once a ground for termination is established, the trial court may terminate parental rights if termination is in the best interest of the child. La. Ch. C. art. 1037(B); State ex rel. B.H. v. A.H., supra.
The issue of parental compliance with a case plan, the parent’s expected success of rehabilitation, and the expectation of significant improvement in the parent’s condition and conduct are questions of fact in a proceeding for termination of parental rights. State ex rel. C.M.M. v. T.P.M., 42,238 (La.App.2d Cir.05/09/07), 957 So.2d 330. In a termination proceeding, the appellate court will not set aside the trial court’s findings of fact unless it was manifestly erroneous. State ex rel. B.H. v. A.H., supra; State ex rel. M.H. v. K.W.H., 40,332 (La.App.2d Cir.09/23/05), 912 So.2d 88.
Among the several, pertinent grounds for termination of parental rights contained in La. Ch. C. art. 1015 are the following:
(4) Abandonment of the child by placing hiin in the physical custody of a nonpar-ent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

j£

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
As stated, to terminate parental rights, the state must prove by clear and convincing evidence the existence of one of the statutory grounds for termination. La. Ch. C. art. 1035. Once a ground for termination has been established, the court may terminate parental rights upon a finding *451 that termination is in the children’s best interest. La. Ch. C. art. 1039; State ex rel. J.W., 46,526 (La.App.2d Cir.06/29/11), 72 So.3d 369.
Here, although it was alleged that C.L. violated more than one of the statutory-criteria required to be proven to terminate parental rights, we determine that the Department’s evidence was clear and convincing particularly as to one of the grounds— that being C.L.’s failure to substantially comply with her case plan and inability to demonstrate 17substantial improvement in correcting the problems that prevented reunification with her children as required under La. Ch. C. art. 1015(5).
At the trial, Kerri Byrd, the Department’s case worker assigned to C.L.’s case, testified regarding C.L.’s compliance with her case plans-there were five approved by the Court, all of which were substantially similar. As described by Byrd, when A.L. came into the Department’s care, she was hospitalized at Children’s Hospital in New Orleans due to a congenital heart defect. The hospital staff called the Department due to concerns that C.L. could not care for A.L. Ultimately, a feeding tube was inserted into A.L., because she failed to thrive. As a result of A.L.’s custody with the Department, concern grew for J.L.’s welfare, and he was also taken into custody.
According to Byrd, two of C.L.’s five case plans had as their goal reunification of the family. In May 2010, the case plan was changed from a goal of reunification to adoption due to “lack of progress on the case plan,” which change was approved by the trial court. As noted by Byrd, the major domains of the case plans addressed food and basic needs. Byrd testified that C.L. was instructed to: maintain a current address with the Department for at least six months, along with notification to the Department within 72 hours if she moved; maintain utilities and an adequate food supply in the house; and, develop a budget. Byrd noted that C.L. did not maintain stable housing, and her homes have not met the needs of her children. Byrd’s records showed that C.L. did not maintain electricity, running water, or an adequate food supply. Moreover, according to Byrd, the Department had |sdocumented 25 moves by C.L. during the time in which the children were in custody, and she did not consistently inform the Department of those moves. Byrd described C.L.’s contact as sporadic.
Another domain of the case plan that C.L. failed to fully comply with was her participation in a parenting class. According to Byrd, C.L. did not visit with her children regularly enough to demonstrate that she learned anything from the classes. Furthermore, C.L. was also instructed to participate in visitation coaching, but the service was closed to her when she failed to participate. Regarding her visitation with the children, Byrd testified that during the Department’s involvement since 2009, she has had 54 scheduled visits, and had only attended 29 of the visits.
Related to C.L.’s housing situation, Byrd testified that there were also issues with C.L. allowing questionable individuals access to her home. C.L. had been instructed not to allow any convicted felons, drug users or sexual perpetrators access to her home. According to Byrd, once when she was bringing C.L. home, a man was being arrested on her front porch for a sexual offense. Byrd felt that C.L. did not understand the danger posed to her children by such individuals. Notably, J.L.’s biological father is a registered sex offender.
Finally, Byrd testified that C.L. was instructed to maintain a budget, which Byrd helped her to devise. However, C.L. was *452 unable to maintain a budget, primarily by failing ever to obtain affordable housing.
Kathy Judd, an instructor of educational programs for LSU Agricultural Center, also testified. C.L. attended parenting classes led by 19Judd, who stated that C.L. began classes in February 2010, attended three classes, stopped for seven months and then began again. Although C.L. completed the program in November, Judd did not feel that C.L. comprehended the class information, nor did Judd believe that C.L. could implement the information covered in class. Notably, Judd testified that C.L. tended to blame others for any problem she had.
Further, the testimony of Dr. John Si-moneaux, an expert in psychology, also clearly proved that C.L. has “no reasonable expectation of significant improvement” in the near future regarding her case plan. Dr. Simoneaux evaluated C.L. twice: approximately two years before the termination hearing and in January 2011. When he initially evaluated C.L., he was limited in the type of test he could administer to her, because her reading ability was so low. Dr. Simoneaux conducted an abbreviated intelligence test on C.L. and determined her full scale I.Q. to be 73, which he described as “the borderline range of functioning just slightly higher than what we would consider to be mental retardation!.]” An I.Q. of 73 placed C.L. in the bottom third percentile in the United States. Dr. Simoneaux opined that C.L.’s low intelligence made it difficult for her to parent, especially children who were medically compromised.
Dr. Simoneaux also described C.L.’s problem with judgment, and how that affected her ability to parent. He described that C.L. lived a very impulsive life and she had very little ability to see how behavior today would affect tomorrow. Dr. Simoneaux noted that she often made decisions based on what felt best at the moment, be that in areas regarding sex, drugs, | inor her housing. She simply made very impulsive, spur of the moment decisions, without any consideration of long-term consequences.
Dr. Simoneaux did note that C.L.’s low I.Q. alone did not necessarily render C.L. unable to parent, but that her I.Q. combined with her personality characteristics were problematic. Both times Dr. Simo-neaux saw C.L., he conducted a Global Assessment of Functioning (“GAF”) on her, which test measures a person’s ability to function. According to Dr. Simoneaux, a perfectly functioning human being would score a 100, with “problems” beginning to present around a score of 70. He noted that the average child protection evaluations he made were in the 60-65 range. In his professional opinion, if a person scored below a 50, he would be reluctant to allow the person to leave his office because that person’s functioning in society would be severely limited. The first time he evaluated C.L., she scored a 50, the lowest score he tended to give. At that time, her GAF score indicated that she was unable to parent her children without risk to them. When he saw her the second time, he believed her functioning condition to be even worse, and her ability to parent worse, in light of the efforts the Department had taken to improve her condition. He saw no improvement in C.L., and perhaps even regression, despite the Department’s efforts.
Dr. Simoneaux noted he would love to say there could be a plan to keep the children with C.L.; however, he did not believe there was such a plan. Supervision under such a case with C.L. would need to be 24 hours a day. He could not envision any protective services that could be put in place for the children. Although he certainly did not think that C.L. had *453 any h, malicious intent with the children, Dr. Simoneaux opined that he didn’t “think there’s much prospect that she’s going to be able to parent these children so I believe termination of parental rights may be the best thing for them.”
Finally, our review of C.L.’s own testimony does little to persuade us that termination of her parental rights was in error. At the termination hearing, C.L. was again pregnant.[1] C.L. contradicted the Department’s assertion that she had moved 25 times during the children’s custody — she maintained it had only been 15 times “more or less,” two of which moves she admitted had been in the last three months. She admitted to not informing the Department of all her moves, because she did not have a phone, nor did she know anyone with a phone to use. Although she and her mother had a violent history together (her mother previously gave her a black eye), C.L. explained that she liked living with her mother, because her mother helped her out with things she “didn’t understand.” When asked if she could relate any parenting techniques she learned in parenting class, she stated how she could “get down to their level, talk to them like a normal person, don’t get mad and don’t show anger or anything”; however, she could not remember any other parenting techniques she had learned. C.L. claimed that she attended over 29 visits with her children (although she did not count them), and the reason she missed so many others was for lack of transportation. Further, C.L. stated she attended only one medical examination, because she did not know she could attend others. C.L. [12admitted there was only one residence she lived in for longer than six months, but she could not remember the reason she moved.
Here, the record shows that the Department has proved by clear and convincing evidence that C.L. failed to comply with her case plan, and that there is no reasonable expectation of significant improvement in her condition and conduct in the near future. It is evident that the Department proved that C.L. was unable to adhere to any case plan the Department set forth. Even if C.L. had moved only 15 times as she claimed, and not the 25 times the Department had records of, that would still be sufficient to show that she failed to maintain a safe and stable home for at least six months as required. The only home C.L. admitted to keeping for six months, she described as being too cluttered for the Department’s standards, and she could not even remember why she moved. Additionally, the Department proved that C.L., although she attended and completed the required parenting classes, was unable to apply the information taught in those classes. Other than one piece of information, C.L. was unable to describe at the hearing any parenting techniques she should have acquired through those classes.
Furthermore, considering that statutory grounds for termination were proven, Dr. Simoneaux’s testimony supports the judgment that termination of C.L.’s parental rights was in the children’s best interest. Considering the deficiencies C.L. has in both intellect and functioning, it does not appear that she will ever have the judgment necessary to care for these two young, medically challenged children. Children need permanency and stability, and |1sforcing them to remain in foster care indefinitely, when there is no hope of reunification, runs afoul of state and federal mandates to further the best interests of the child. State ex rel. J.J.B. v. A.N.B., 45,238 (La.App.2d Cir.03/03/10), 32 So.3d *454 372. Thus, the trial court did not err in finding that it was in the best interest of the children to terminate C.L.’s parental rights and free them for adoption.
Conclusion
Considering the foregoing, the judgment of the trial court terminating C.L.’s parental rights as to her minor children, J.L., and A.L. is affirmed. All costs of this appeal are assessed to C.L.
AFFIRMED.

. That child is currently in the custody of the Department.