WILLIAMS, J.
B SMS, the mother of four minor children, appeals a judgment of the Caddo Parish juvenile court that irrevocably dissolved and terminated her parental rights to one of her children, MTS, and certified the child for adoption. For the reasons set forth below, we affirm the juvenile court’s decision.
FACTS
SMS. is 23 years old; she is the mother of four children, including four year old MTS. BDG is MTS’s biological father.
During his infancy, MTS was admitted to the hospital on multiple occasions due to respiratory difficulties. He was diagnosed with asthma and laryngomalacia.[1] On March 5, 2011, MTS, who was then six months old, was admitted to the hospital; his condition was described as “lethargic and gasping for breath.” He was admitted to the pediatric intensive care unit (“PICU”) and was subsequently discharged on March 17, 2011. His discharge orders included prescriptions for a number *1027 of medications, breathing treatments, the administration of oxygen as needed, a home health nurse to assist the parents with MTS’s care and follow-up medical appointments.
On March 22, 2011, the State of Louisiana, through the Department of Children and Family Services (“DCFS”), received a report that the parents had not had any of MTS’s prescriptions filled and were not administering his breathing treatments or oxygen. Thereafter, DCFS and the home health agency attempted to provide the parents with assistance in |2arranging follow-up medical appointments and additional home health assistance. Two days later, DCFS learned that the parents still had not taken the prescriptions to a pharmacy to be filled. By this time, MTS was experiencing difficulty breathing and his oxygen levels were decreasing.
DCFS obtained an instanter order removing MTS from the custody of his parents and placing him in its custody based on allegations of medical neglect. Initially, MTS was placed in the care of his maternal grandmother and his parents were given “liberal visitation.” However, that arrangement was unsuccessful because DCFS learned that the grandmother was “giving the child back to [SMS].” MTS was removed from his grandmother’s care and placed in foster care with CH, his current foster mother.
On May 20, 2011, MTS was adjudicated a child in need of care. DCFS developed, and the juvenile court approved, an initial case plan wherein the permanent plan for MTS was reunification with his parents. The case plan contained the following requirements: (1) undergoing psychological evaluations; (2) maintaining adequate housing; (3) completing parenting classes; (4) completing an anger management course; (5) attending and participating in medical appointments scheduled for MTS; (6) attending scheduled weekly visitations with MTS; (7) attending court appearances, (8) attending family team meetings; (9) keeping DCFS apprised of the parents’ whereabouts; and (10) providing financial support for MTS.
Subsequently, following multiple disposition hearings, the juvenile court approved a number of additional case plans, with which the parents | afailed to comply. Other than undergoing psychological evaluations, neither parent completed any of the classes/services arranged for them. SMS moved frequently, and DCFS was often unable to locate her. The parents also failed to attend more than one-half of the scheduled visitations with MTS and did not attend his medical appointments. The father provided some financial support; however, the mother failed to provide any support for MTS. Additionally, during the reunification attempt, both parents pled guilty to criminal charges and were incarcerated for much of 2012.[2]
By early 2013, both parents had been released from prison. However, they continued to be largely non-compliant with the reunification case plan. A DCFS case worker described the parents’ attempts to *1028 comply with the plan as “a pattern of starts and stops.” The worker explained that SMS would verbally agree to attend classes and counseling sessions, but she would fail to follow through. DCFS attempted to obtain SMS’s cooperation by alternating between in-home services and group sessions, and by providing transportation to and from counseling sessions, visits and appointments. SMS failed to comply with the alternate plan.
On September 13, 2013, DCFS filed a petition for involuntary termination of the parental rights of both parents and to certify MTS for |4adoption. Following a hearing, the juvenile court found, by clear and convincing evidence, the necessary grounds for terminating the parental rights of both parents. The court stated, in pertinent part:
[T]he crux of the case is the parents’ repeated failure to comply with a required program of treatment and rehabilitative services in this case plan.
⅞ i\i *
The crux of this case was parenting. Not just medical education, but parenting designed to impress upon the parents that[,] despite all the other very important aspects of parenting!,] the physical needs of the child — particularly in this ease, the medical needs of the child — have to be the highest priority as a parent. They didn’t even attend the parenting classes designed to help them understand that, appreciate that, implement that. Therefore, there was a significant lack of substantial improvement in addressing the problems preventing reunification. That was the crux of it. Those conditions didn’t just persist over a one-year period of time, which is the minimum amount of time[,] generally!,] before termination of parental rights can take place. This persisted over a three-year period of time.
[[Image here]]
It seems abundantly clear to me that despite the problems of the parents, there is no way around the fact that the needs of this child have to come first!.] [A]nd if those problems of the parents significantly interfered with the rehabilitative plan for the parents, it’s not a defense against termination of parental rights. They have to be able to work a case plan, improve their condition to ensure a healthy, safe environment for the child despite the problems that may befall them!.] [T]he most important thing, the highest priority, is the health, safety and welfare of this child.
The next element is whether it’s in the best interest of the child, and that is, frankly, not a difficult decision. [MTS] has been in foster care for three years. Three years. The attempt to keep him in a family setting proved unsafe. His current home has become a pre-adoptive home with the foster parent providing the love, care and attention that this child has required and will require. There is a psychological child/parent relationship in this pre-adoptive home. It would be contrary to the best interest | flof the child to separate them.
⅜: ⅜ ⅜
The mother now appeals.[3]
DISCUSSION
SMS contends the state failed to meet its burden of proving that she has not substantially complied with her case plan. She also contends the state failed to meet its burden of proving that there is no *1029 reasonable expectation of reformation in the foreseeable future.[4]
It is well settled that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. State in Interest of A.C., 93-1125 (La.1/27/94), 643 So.2d 719, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995); State in Interest of ASW, 49,310 (La.App.2d Cir.6/25/14), 144 So.3d 1193. This parental interest includes the companionship, care, custody and management of his or her children. Lassiter v. Dept. of Social Svcs., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); State in Interest of J.M.L., 47,201 (La.App.2d Cir.4/11/12), 92 So.3d 447. Congruent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in Interest of A.C., supra; State in Interest of ASW, supra.
A court may involuntarily terminate parental rights when the state proves the following elements: (1) at least one year has elapsed since the child was removed from the parent’s custody pursuant to a court order; (2) there has been no substantial parental compliance with a case plan which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and (3) despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home. LSA-Ch.C. art. 1015(5).
To terminate parental rights, the state must meet the onerous burden of proving one of the statutory grounds for termination set forth in LSA-Ch.C. art. 1015, by clear and convincing evidence. LSA-Ch.C. art. 1035(A); State in Interest of J.M.L., supra. Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence. State in Interest of J.M.L., supra.
LSA-Ch.C. art. 1036 provides, in pertinent part:
[[Image here]]
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
|7(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of *1030 treatment and rehabilitation services provided in the case plan.
-(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
[[Image here]]
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
[[Image here]]
In a proceeding for termination of parental rights, the issue of parental compliance with a case plan, the parent’s expected success of rehabilitation, and the expectation of significant improvement in the parent’s condition and conduct are questions of fact. An appellate court | ^cannot set aside a trial court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. State ex rel. C.M.M. v. T.P.M., 42,238 (La.App.2d Cir.5/9/07), 957 So.2d 330; State ex rel. S.S.S., 39,047 (La.App.2d Cir.8/18/04), 880 So.2d 153.
Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. However, the primary concern of the courts and the state remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the state. State ex rel. J.M., 2002-2089 (La.1/28/03), 837 So.2d 1247; State ex rel. S.M.W., 2000-3277 (La.2/21/01), 781 So.2d 1223.
In the instant case, Andrea Mitchell, the family’s foster care case manager, testified with regard to the court-approved case plans. She stated that the case plans required SMS to: (1) undergo a psychological evaluation; (2) maintain adequate housing; (3) complete parenting classes; (4) complete an anger management course; (5) attend weekly scheduled visitation with MTS; (6) attend and participate in MTS’s medical appointments; (7) keep DCFS apprised of her whereabouts and circumstances; (8) financially support MTS by paying support as ordered; (9) attend all court appearances; and (10) attend all scheduled family team meetings.
Ms. Mitchell testified that she provided SMS with a copy of the case plan and reviewed it with her. Additionally, Ms. Mitchell testified that SMS completed her psychological examination; however, she did not comply with any other aspects mandated by her case plan. Further, according to [9Ms. Mitchell, SMS attended less than one-half of the scheduled visits with MTS and that she only attended one of the child’s medical appointments.
Stephanie Mesloh, a case manager for Community Support Programs in Shreveport, the agency that provided the parent education classes for SMS, testified as follows: she completed SMS’s “intake” assessment on June 10, 2013; SMS agreed to *1031 complete the parenting course; SMS’s participation in the classes was “sporadic”; after the initial assessment, SMS failed to show up for the first class; thereafter, the agency was unable to make contact with SMS; SMS later resumed the classes; SMS experienced difficulty completing the classes due to another pregnancy and various other conflicts; the agency agreed to wait until after SMS gave birth to her fourth child to reinitiate the classes; after SMS had her baby, she “appeared very, very enthusiastic” about attending the classes; however, she only attended “a couple of times and then [she] quit coming”; the agency’s attempt to complete the classes in SMS’s home proved difficult because “there were too many people present for the visits”; SMS was later enrolled in “group classes”; SMS failed to attend those classes as well; SMS completed approximately seven classes out of 16.
With regard to the “visit coaching” services provided to SMS, Ms. Mesloh testified as follows: she attended the visits between SMS and MTS; she and SMS would devise a “coaching plan” regarding what activities would take place during the visit; SMS would often either fail to show up for the visit, or she would fail to bring the items she had agreed to bring for MTS; when SMS would attend a visit, she would sit in a chair and talk |inbriefly to MTS; SMS had very little interaction with MTS; SMS would talk to the adults present at the visit, but she would not play with MTS; SMS attended the last parenting class on September 24, 2013; when SMS failed to show up for any other classes, the agency attempted to contact her by calling her and going by her house; ultimately, the agency closed SMS’s case in November 2018, after being unable to contact her for a period of more than 30 days.
John Green, the CASA volunteer assigned to this matter, testified as follows: he had been assigned to the case for approximately three years; he had observed several visits between SMS and MTS; SMS failed to attend several scheduled visits; he had advised SMS that it was “imperative that [she] ... follow [her] case plan ... [and] come to see [MTS] at every given opportunity”; SMS moved “quite often,” making his attempts to visit her home unsuccessful; MTS appeared to have a loving relationship with his foster mother; and MTS “is doing good in his current placement” with his foster mother.
Anthony Williams, a licensed professional counselor, was accepted by the court as an expert in his field. Mr. Williams testified that he had provided counseling and parenting classes to SMS at intervals throughout this case. He also stated that he had observed SMS with her other children and she seemed to be “okay as a parent for her children.” Mr. Williams opined that SMS would “do a good job” parenting MTS if she is provided the proper instructions and training regarding his medical needs. He also stated that SMS did not know how to meet MTS’s medical needs because 1 n“no one had told her” how to do so. However, Mr. Williams was quite candid in admitting that he would often have difficulty locating SMS, primarily due to her frequent moving. Mr. Williams also admitted that housing is unstable in this case because SMS “moves from place to place.” Further, he admitted that SMS has never completed any of the services offered by him. According to him, SMS would initially attend classes “pretty regular[ly]”; then, she would stop attending and he would lose contact with her. With regard to the child’s best interest, Mr. Williams testified that over a three-year period, he had only observed MTS with SMS on three occasions, and he did not know if returning him to his moth *1032 er was in his best interest. He stated that although SMS had verbally expressed her desire to get MTS back, her actions have not shown that she is doing everything she is required to do to have her child returned to her.
CH, MTS’s foster mother, testified as follows: MTS has been in her home for approximately three years; she and MTS have a loving relationship; MTS has to be monitored closely for things that may exacerbate his asthma; when he has an asthma attack, she is required to administer breathing treatments every two hours for “maybe a day and a half until I get it under control”; if the breathing treatments are not effective, she has to take MTS to the emergency room; the visits between MTS and SMS were scheduled at the “state building” every Monday; SMS fails to attend the visits “a couple of times a month”; when the parents fail to attend the visits, MTS asks about his father, but not about SMS; during the visits, MTS does not pay any attention to SMS because he prefers to play with his 11?father; if she adopts MTS, she would be willing to allow him to continue his relationship with his parents; she has provided the parents with a demonstration of how to administer MTS’s breathing treatments; the parents stated that they understood how to operate the machinery.
Dr. Hester Suh, MTS’s pediatrician, testified as follows: she has been treating MTS since October 2013; MTS has “moderate, persistent asthma”; MTS requires daily medications for his condition; asthma patients who take care of their condition require less hospitalizations; patients with persistent asthma end up in the emergency room or PICU “quite frequently” when they do not take their medication; MTS’s condition requires vigilance and his caretaker must be “on top of it” to make sure he is given his “as needed” medication when he begins to exhibit symptoms; caretakers must be observant of the child’s environment, become familiar with what triggers the child’s symptoms and quickly respond; CH has “done a great job” in caring for MTS; the care provided by CH has minimized his symptoms and his medical emergencies; it is not difficult to administer a breathing treatment.
During the hearing, SMS testified as follows: she understands why MTS was removed from her care; she did provide MTS with the necessary medication; she and MTS’s father were responsible for obtaining the medication; DCFS has not provided her with any training or instructions on caring for MTS’s medical needs, nor has she requested the state to do so; she has learned about taking care of a child “with breathing problems” by observing the care provided to her young niece who has asthma; she has 113taken the initiative to learn by going to her niece’s appointments and asking questions and by observing her mother administering her niece’s breathing treatments; MTS’s foster mother has shown her how to administer a breathing treatment; she has moved approximately 10 times since MTS was removed from her care; she currently lives in a home with her three other children, her mother, her mother’s two young children, her sister and her sister’s child; she gets most of her information about MTS from calling his foster mother or by calling the child’s paternal grandmother; it would be difficult to “stay on top of’ MTS’s medical needs while attending to her other three children; she understood that her case plan required her to complete her parenting classes; her case worker explained what was expected of her with regard to the case plan; she has attended court on a number of occasions and learned what was expected of her; she “somewhat” completed the case plan when MTS was first removed from her care; she *1033 did not complete the parenting classes; she attended one anger management class but she did not complete the course; the case plan required “too much stuff for [her] to be doing”; she did not pay child support because she had “other things that [she] had to pay,” such as probation fees; she only missed “one or two” scheduled visitations with MTS, except when she was incarcerated; she only missed visits when MTS was sick or it was too cold for him to visit; she has never cancelled any visits with MTS; she “came close” to completing her case plan.
It is undisputed that at least one year had elapsed since MTS was removed from the custody of his parents pursuant to a court order. In fact, |14by the time the termination proceedings were initiated, MTS had been in DCFS custody for approximately three years. In its reasons for judgment, the juvenile court specifically found that DCFS had proven, by clear and convincing evidence, the elements of one of the grounds for the termination of the parents’ parental rights and that it was in the best interest of MTS that he be freed for adoption. Specifically, the court found that SMS had repeatedly failed to substantially comply with the case plan and that she had demonstrated a “significant lack of substantial improvement in addressing the problems preventing reunification.” The evidence established that SMS had failed to attend more than one-half of the court-approved scheduled visitations with MTS over a three-year period; she moved frequently and. failed to keep DCFS apprised of her whereabouts; she failed to contribute to the costs of MTS’s foster care despite being ordered to do so; and she failed to comply with the rehabilitative aspects of the plan, such as the completion of parenting and anger management classes.
After a thorough review of the record, we find the juvenile court’s factual findings, as set forth above, are reasonably supported by the record and are not clearly wrong. The juvenile court considered testimony and evidence of SMS’s lack of compliance with her case plan. The case plan required a myriad of steps with which SMS was required to comply prior to being reunified with her child. SMS admitted that she only managed to complete one aspect of the plan, submitting to a psychological examination, over a period of three years. She also candidly admitted that the plan contained “too much stuff for [her] to be doing.” As a result, we affirm the 11¿finding of the juvenile court, based on clear and convincing evidence. We agree with the court that SMS had not substantially complied with the plan and there was no reasonable expectation that she would significantly improve her condition in the near future. This assignment lacks merit.
The mother also contends the juvenile court erred in finding that termination of her parental rights was in the best interest of her child. She argues that Anthony Williams, the state’s expert, opined that it was in MTS’s best interest to reside with her.
 Once a ground for termination is established, the trial court may terminate parental rights if termination is in the best interest of the child. LSA-Ch.C. art. 1037(B); State in Interest of supra. In State in Interest of B.J., 48,857 (La.App.2d Cir.1/15/14), 135 So.3d 777, 782, this court stated:
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide *1034 the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing, by providing an expeditious judicial process for terminating all parental rights and responsibilities and achieving permanency and stability for the child.
Children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interest of the child. State ex rel. J.M., supra; State ex rel. C.M.M., supra.
Iifiln the instant case, the juvenile court found that it is in the best interest of MTS that the parental rights of his mother be terminated and that he be freed for adoption. The evidence established that SMS has demonstrated that she is unwilling or unable to provide adequate care for the physical, emotional, and mental health needs of MTS. Despite being given multiple opportunities to learn how to parent and meet the medical needs of her child, SMS has made little effort to do so. She testified that she learned to attend to a child with asthma by attending her niece’s medical appointments and by asking questions of her niece’s medical providers. However, when given an opportunity to attend her own son’s medical appointments and to ask questions concerning his care, SMS failed to do so. There is no evidence that her ability to care for MTS has improved since DCFS became involved in this case over three years ago. MTS has resided in the same placement for approximately three years, and his foster mother has expressed her desire to continue to care for him indefinitely. Most notably, MTS has received consistent medical treatment at his current placement, which is vital to his best interest. Accordingly, we find that the juvenile court did not err in finding that the best interest of MTS will be served by terminating SMS’s parental rights and certifying this child for adoption.
CONCLUSION
For the reasons set forth herein, we affirm the judgment of the trial court, terminating the parental rights of SMS to MTS. Costs of this appeal are assessed to SMS.
AFFIRMED.

. Laryngomalacia is a softening of the tissues of the larynx which causes the tissues to collapse and obstruct the airway.

. The minutes from 1st Judicial District Court, Parish of Caddo, show that on March 20, 2012, SMS was charged with two counts of forgery and one count of accessory after the fact to armed robbery. On August 20, 2012, she pled guilty to one count of forgery and accessory after the fact to armed robbery; she was sentenced to serve concurrent sentences of seven and five years at hard labor, with all but two years of the sentence suspended.
On March 20, 2012, the father was charged with forgery and armed robbery; he later pled guilty to forgery; the armed robbery charge was dismissed. He was sentenced to serve seven years at hard labor, with all but two years of the sentence suspended.

. The father did not appeal; therefore, the judgment terminating his parental rights is final and will not he addressed in this opinion.

. Much of SMS’s argument centers around the requirements set forth in the case plan. For example, she maintains that none of the classes or services mandated by the case plan specifically addressed MTS’s medical needs. However, as stated above, the juvenile court approved multiple case plans in this matter. SMS did not object to the case plans, nor did she appeal the juvenile court’s orders approving the case plans. Therefore, by failing to appeal the juvenile court’s approval of the case plans, SMS has waived her arguments with regard to the requirements set forth therein. Accordingly, the arguments regarding the specific requirements of the case plan will not be addressed in this opinion.