WILLIAMS, J.
*931 T.J.H., the mother of M.L.H., appeals a judgment of the Caddo Parish juvenile court that irrevocably dissolved and terminated her parental rights and certified the child for adoption. For the reasons that follow, we affirm.
FACTS
M.L.H. was born on August 28, 2015. Her mother, T.J.H, has a moderate intellectual disability (formerly known as mental retardation ) with an IQ of 52, and she is HIV-positive.[1] M.L.H.'s biological father is unknown.[2] Additionally, the mother has reported that she is bipolar, schizophrenic and that she has ADHD. M.L.H. has been in and out of the custody of the Department of Children and Family Services ("DCFS") since she was approximately four months old.
In December 2015, M.L.H. was removed from her mother's custody after DCFS received a report that she was not gaining weight and she was often observed to be "dirty," wearing soiled diapers. However, the child was returned to her mother following a continued custody hearing held on December 17, 2015. At that time, the trial court ordered DCFS to provide services aimed to assist the mother in applying for food stamps and to assist her in learning how to clean and maintain her home. The mother was also referred to Life Changing Solutions and Homebuilders. The services provided included case workers coming into the mother's home to teach her certain life skills aimed at assisting her in maintaining a clean home and properly caring for M.L.H.
Once the services provided by DCFS ended, T.J.H. continued to struggle with caring for M.L.H. Dr. Sheila Farrell, a pediatrician at University Health in Shreveport, examined M.L.H. and expressed concern that the mother was feeding the young baby a mixture of baby food and water instead of formula. Dr. Farrell noted that M.L.H. was underweight and observed that the mother seemed to lack the capacity to properly care for the child. Dr. Farrell opined that when the services DCFS had provided to the mother ended, the mother began to revert to her old habits of not properly caring for M.L.H.
Dr. Ann Springer, another pediatrician at University Health, also examined M.L.H. She noted that the child had an ear infection, a "bad" diaper rash and that she was not gaining weight. Dr. Springer expressed *932 her "concerns" that the mother lacked an understanding of how to feed M.L.H., despite being educated on how to do so.
Later in December 2015, M.L.H. was once again removed from the mother's custody. However, the juvenile court vacated the order and custody was returned to the mother. Thereafter, the mother's struggles with caring for M.L.H. continued: DCFS noted that the child was not being properly fed, she was not gaining weight and the mother was not keeping the child's medical appointments.
On March 23, 2016, DCFS received a report that the mother was not properly feeding M.L.H, the child was not gaining weight, was often observed to be "dirty" and was infected with head lice. Additionally, the daycare providers reported that M.L.H. usually arrived at the daycare with a heavily soiled diaper and without enough formula for the day. During the course of its investigation, DCFS learned that the mother was not giving M.L.H. the medication that had been prescribed to ward off the HIV virus. DCFS also discovered that M.L.H. had missed multiple medical appointments, which the mother never rescheduled. During her interview with the DCFS worker, the mother admitted that she fed M.L.H. by mixing water with baby food in a bottle and that she would "forget" to send formula to the daycare with the child. Further, an inspection of the mother's home revealed that it had a foul odor, the floor was cluttered with toys and clothing, the stove was covered with dirty pots and roaches were present inside the home.
On March 24, 2016, DCFS received an instanter order removing M.L.H. from her mother's custody and placing her in the custody of DCFS. On June 7, 2016, she was adjudicated a child in need of care ("CINC"). The court's disposition order continued custody with DCFS and approved an initial case plan wherein the permanent plan for M.L.H. was reunification with the mother. Due to the mother's limited intellectual/cognitive ability, the plan was simplified. The case plan contained the following requirements: (1) maintaining stable, adequate and clean housing; (2) following the cleaning instructions provided by DCFS service providers; (3) maintaining sufficient food in the home to feed herself and M.L.H.; (4) paying $25 per month to contribute to the care of M.L.H. in foster care; (5) attending parenting classes; (6) undergoing a mental health evaluation; (7) attending scheduled visits with M.L.H.; (8) maintaining regular contact with DCFS; (9) completing a medical examination to address the mother's current health issues and complying with all recommendations, including taking her medication and keeping her medical appointments; (10) completing a psychological examination and complying with all recommendations; (11) completing a psychiatric examination to assess the need for medication; and (12) cooperating with service providers and complying with all recommendations.
Subsequently, following multiple custody review hearings, the juvenile court changed the goal from reunification to adoption, finding lack of substantial compliance with the case plan by the mother and alleged father. On May 1, 2017, DCFS filed a petition to terminate the parental rights of the mother, A.L.P., "John Doe and/or any unknown father of [M.L.H.]." Following a hearing, the juvenile court found, by clear and convincing evidence, the necessary grounds for terminating the parental rights of the mother, A.L.P. and "John Doe and/or Any Unknown Father of [M.L.H.]." In its judgment, the court stated, in pertinent part:
* * *
*933 6. [DCFS] has proven by clear and convincing evidence * * * that [the mother] has failed to work a court approved family case plan to ensure the minor child's health and safety, and make significant measurable progress towards alleviating the conditions that required the minor child to be in the custody of [DCFS], and her parental rights should be terminated.
* * *
9. The physical, mental and emotional welfare needs of the minor child, [M.L.H.], would best be served by terminating the parental rights of [the mother], [A.L.P.], John Doe and/or any unknown father of [M.L.H.] * * *; and that the child be freed and certified for adoption.
* * *
The mother appeals.[3]
DISCUSSION
The mother contends the trial court erred in terminating her parental rights. She argues that DCFS did not prove, by clear and convincing evidence, the statutory grounds for termination or that terminating her parental rights was in the child's best interest. According to the mother, she has a mental and/or intellectual disability, which required DCFS to provide her with specialized services. She complains that DCFS failed to implement the services necessary to assist her in completing her case plan.
It is well settled that a parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. State in Interest of A.C. , 1993-1125 (La. 1/27/94), 643 So.2d 719, cert. denied , 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995) ; State in Interest of MTS , 49,630 (La. App. 2d Cir. 1/14/15), 161 So.3d 1025. This parental interest includes the companionship, care, custody and management of his or her children. Lassiter v. Dept. of Social Svcs. , 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) ; State in Interest of MTS, supra. Congruent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in Interest of A.C., supra ; State in Interest of MTS, supra ; State in Interest of ASW , 49,310 (La. App. 2d Cir. 6/25/14), 144 So.3d 1193.
A court may involuntarily terminate parental rights when the state proves the following elements: (1) at least one year has elapsed since the child was removed from the parent's custody pursuant to a court order; (2) there has been no substantial parental compliance with a case plan which has been previously filed by DCFS and approved by the court as necessary for the safe return of the child; and (3) despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his or her need for a safe, stable, and permanent home. La. Ch.C. art. 1015(5).
To terminate parental rights, the state must meet the onerous burden of proving one of the statutory grounds for termination set forth in La. Ch.C. art. 1015, by clear and convincing evidence. La. Ch.C. art. 1035(A) ; State in Interest of MTS, supra. Proof by clear and convincing evidence requires a showing that the existence of the disputed fact is highly probable, meaning more probable than its nonexistence.
*934 State in Interest of MTS, supra ; State in Interest of J.M.L. , 47,201 (La. App. 2d Cir. 4/11/12), 92 So.3d 447.
At the time these proceedings were initiated, La. Ch.C. art. 1036 provided, in pertinent part:
* * *
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep [DCFS] apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems of preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
* * *
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
* * *
In a proceeding for termination of parental rights, the issue of parental compliance with a case plan, the parent's expected success of rehabilitation, and the expectation of significant improvement in the parent's condition and conduct are questions of fact. An appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. State in Interest of MTS, supra ; State ex rel. C.M.M. v. T.P.M. , 42,238 (La. App. 2d Cir. 5/9/07), 957 So.2d 330.
Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. However, the primary concern of the courts and the state remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the state. State ex rel. J.M. , 2002-2089 (La. 1/28/03), 837 So.2d 1247 ; State in Interest of MTS, supra.
In the instant case, Sylveria Hunt, the mother's DCFS case worker, testified as follows: before M.L.H. was adjudicated in need of care, DCFS worked with the family to provide "family services," whereby M.L.H. was allowed to remain in the home after DCFS had identified issues that could ultimately result in the removal of *935 the child from the home; the goal of family services is to assist the mother in an effort to prevent removing M.L.H. from the home; after M.L.H. was placed in DCFS custody, the mother's case plan required her to pay $25 per month to contribute to the cost of her child being in foster care; the mother stated that she would make the monthly payments but she has never done so; she observed the mother and child during visits; the mother has a "very loving relationship with [M.L.H.]" and she is "very affectionate" toward the child; the mother interacts well with M.L.H. and is "always glad to see "[M.L.H.]"; M.L.H. recognizes the mother and the two "play a lot" during visits; the mother's role during visits seem to be "more playful" than parental; she has observed M.L.H. with her foster parents and they are "very affectionate towards each other"; M.L.H. seeks her foster parents for comfort; M.L.H. shares a bond with her foster parents and their extended family; the mother's visits with M.L.H. were reduced from weekly to once a month after the goal was changed from reunification to adoption; DCFS referred the mother to Michell Redding, LPC, LMFT, at the Redding Therapy Center for individualized parent counseling; Ms. Redding opined that the mother was unable to parent M.L.H. due to her cognitive limitations and an inadequate support system; it is the recommendation of DCFS that the parental rights of the mother, A.LP., and any other unknown father(s) be terminated and that M.L.H. be freed for adoption.
On cross-examination, Ms. Hunt testified that the mother's case plan "was written in a very simplified manner stating specifically what she needed to do"; Dr. Pinkston and other service providers had experience with working with people with intellectual disabilities; the mother was provided with individualized parent counseling; Redding reported that the mother would be able to parent a child "with a strong support system"; DCFS did not evaluate the mother's boyfriend with regard to his ability to parent because the mother had only been living with him for a short period of time; and she returned the mother's telephone calls and kept the mother updated regarding M.L.H.'s ear surgeries so that she would have the opportunity to be present for the surgeries.
A report prepared by Redding was introduced into the record. In the report, Redding expressed that the mother has displayed "genuine love, care and concern" for M.L.H. She also reported that the mother has been actively engaged in the parenting classes and that she had been "retaining information taught" in the classes. Nevertheless, Redding opined:
Unfortunately, due to [the mother's] cognitive limitations, she has not proven, based [on] her own independence that she is able to care for a baby. As stated prior, [the] therapist assisted [the mother] with what if and what to do scenarios. [The mother] was not able to determine the following: time (what time the baby would need medication if given every x amount of hours), amount (identify 4 oz on the baby bottle), (how many spoons are in x amount of spoonfuls). [The mother] also demonstrates poor judgment.[4]
The mother testified as follows: she completed seven parenting classes; she had a history of seizures but she no longer took her anti-seizure medication; her case *936 plan only required her to "take parenting"; she did not know she was required to pay parental contributions in the amount of $25 per month while M.L.H. was in foster care; she received $733 per month in SSI benefits; she lived with her boyfriend and they "split the bills down the middle"; she took her medication for HIV regularly, but she was unsure of the name of the medication; she saw her doctor in December 2016 but she had not scheduled an appointment for another visit; she had a son who passed away prior to his first birthday; M.L.H. had been removed from her custody on three separate occasions; the first time, M.L.H. was removed because "they said something about medical neglect or something"; M.L.H. was removed the second time because "she was losing weight and gaining weight," the phrase "failure to thrive" means "gaining weight and losing weight"; M.L.H. was also removed from her custody because she had "two [missed] doctors' appointments"; the juvenile court did not order DCFS to assist her with keeping her home clean and obtaining food stamps; she was not aware that she was supposed to comply with court orders regarding participating in services provided by DCFS; she took care of M.L.H. and she was not "beating her"; it was not her fault that M.L.H. failed to gain weight because "[y]ou can't make a baby grow weight overnight"; she fed M.L.H. with a mixture of baby food and water on one occasion because her sister suggested that she do so; mixing water and baby food and feeding it to her baby was not harmful "because my sister did it one time with her kids" and "my daddy did it with all four of us"; during high school, she was in special education and she "graduated from the tenth grade"; she had not received a GED; she did not proceed to the 11th grade in high school because "that was all. That was it. I graduated. That's all my classes. Plus I had bigger plans to go to college and make something of my life"; she did not go to college because "you got to take a step at a time"; she plans to get her own house and car "and then go to college"; she cannot enroll in college now because her boyfriend's "truck broke down"; she received SSI disability benefits because she had a seizure disorder and she "draws off [her] daddy"; she had been diagnosed with "bipolar, ADHD and sisterfrenic [sic]"; she does not take medication for any of her psychiatric/psychological diagnoses; and her visitation schedule with M.L.H. is every week but she visits with her "every other week."
When questioned by her attorney, the mother testified as follows: M.L.H. has her own room in the house she shares with her boyfriend; she and her boyfriend have been together "a little bit over a year" but are not planning to get married; she has family support from her father and her sister, who lives in Texas; if she cannot regain custody of M.L.H., she would like the court to consider placement with her sister because "I can trust my sister"; her sister, her sister's three children and her sister's boyfriend live with her mother and her mother's husband; Sylveria Hunt is her DCFS case worker; there is little communication between her and Hunt because "she don't [sic] ever return my phone calls"; she sometimes has to resort to contacting Hunt "through my daddy's old case worker";[5] her house is clean and free from safety hazards; she no longer receives food stamps because "they cut me off because they had to do an update"; Hunt did not tell her that she had to pay $25 per month; she underwent a psychiatric *937 examination and had a "full scan on my head [to] see if I'm going to be able to take care of [M.L.H.] or not"; Hunt scheduled a doctor's appointment for her to determine if she needed to be placed on psychiatric medication; and she was placed on Seroquel for "my diagnosis"; in parenting classes, she learned "how to change a baby, baby needs, all type[s] of stuff";[6] she knows how to cook and operate kitchen appliances; she attends her visits with M.L.H.; she accompanies M.L.H. to her doctors' appointments; she sees a counselor every Thursday; the counselor is teaching her "how to open your ears and listen to your baby and stuff like that"; she is opposed to M.L.H. being certified for adoption because "I don't know why they took her in the first place. I really don't know why. Everybody makes mistakes, and everybody learns from it"; M.L.H. was removed from her custody "for nothing"; she has not seen A.L.P. in "way over a year" and she does not know where he lives; A.L.P. "denied a DNA test so I'm not worrying about that"; and she is agreeable to complying with her case plan.
The mother further testified as follows: she has lived with her boyfriend for approximately two weeks; prior to that, she lived with her father; if the relationship between her and her boyfriend ended, she would live with her father or her mother; she would more than likely live with her father because he "raised all of us"; her case plan required her to "keep doing good, but that's about it"; "somebody went over" the case plan with her and told her what she needed to do; and she is "upset" because M.L.H. was removed from her custody.
M.L.H.'s foster mother testified as follows: M.L.H. was placed in her home each time she was removed from the mother's custody; M.L.H. arrived at her home on two occasions in December 2015 with a severe diaper rash and an ear infection; M.L.H.'s diaper rash and ear infection had not healed when the child returned to her home in March 2016; she and her husband took M.L.H. to the hospital on consecutive days so that she could receive Rocephin injections for treatment of the ear infection;[7] the pediatrician prescribed Nystatin for the diaper rash and the rash "cleared up very quickly"; M.L.H. was two years old and was "doing remarkably well" since being placed in her home; M.L.H. was "very playful, very happy"; initially, healthcare professionals had expressed concerns that M.L.H. would have developmental delays; when the child was first placed in her home, she exhibited weakness on her right side, had difficulty swallowing and had issues with coordination; the symptoms improved with therapy; a Court Appointed Special Advocate ("CASA") volunteer was appointed to the case; a CASA representative had been to her home three times since being appointed; the volunteer brought Christmas gifts for M.L.H. in "December, early January"; she had observed the mother's interactions with M.L.H.; the mother was attentive to the child; during visits, the mother plays with the child and gives her snacks on occasion; she and her husband have a 15-year-old daughter who has bonded with M.L.H.; and she and her *938 husband would be willing to adopt M.L.H. in the event she was freed for adoption.
Jonathan Jackson, the mother's live-in boyfriend, testified as follows: he attends visits between the mother and M.L.H.; he is prepared to welcome M.L.H. into his home; he is employed and he owns his home; he does not have any children; he has a truck that is undergoing repairs; he does not know what medication the mother takes; the mother "goes every now and then to the little center" to get "disease clinic medicine"; the mother is unemployed; he purchased his home from a family member in "a rent to own type deal"; and he and the mother "pretty much split" the utility bills.
J.H., the mother's father, testified as follows: he has observed the mother's interactions with M.L.H.; the mother was "real nice to the baby" and she "fix[es] a bottle and give[s] her a bath at night"; the mother and her boyfriend had an "appropriate home" for M.L.H.; the mother would be able to be a "proper parent" to M.L.H.; he is willing to help the mother with M.L.H.; he receives a social security check every month; he lives with his son's ex-wife; he expects to have an apartment "in two months"; he frequently visits the home the mother shares with her boyfriend; he never visits for long because his mode of transportation is the bus; prior to living with his son's ex-wife, he lived in an apartment with one of his daughters; and he and his daughter moved because snakes were coming inside the apartment.
T.H., the mother's sister, testified as follows: she, her boyfriend and her three children lived in Texas in a home with her mother and stepfather; she would be willing to be a relative placement for M.L.H.; her mother's house has five bedrooms; her mother had agreed to allow M.L.H. to live with her; she was willing to cooperate with a home study; she has visited with M.L.H. "a couple of times" during the mother's visitation "at the State Building"; M.L.H. has never stayed a night at her house; she and her family moved to Texas in an effort to have "a better life for me and my family"; her mother has a car and "she takes me wherever I need to go"; she did not have transportation in Louisiana; before she moved to Texas, she lived in an undesirable area, her apartment had roaches and there were snakes around the apartment complex; she and her boyfriend are unemployed; she receives SSI disability benefits because she has "bipolar one, two and three, major depression and thyroid problems"; her boyfriend receives benefits because "he has seizures"; before leaving Louisiana, she was investigated by DCFS on three occasions; two investigations were initiated because her daughter's school reported that her daughter had "repeatedly [sic] head lice and [was] coming to school smelling"; as a result of the third investigation, two of her children were removed from her custody because "they found something in her system. I can't remember what it was"; her son was hospitalized for failure to thrive; her children were returned to her custody after three days; she does not remember the last time she saw M.L.H.; and she and her siblings spent time in foster care as children.
Frances McInnis,[8] a supervisor for CASA, testified as follows: she takes on the role of an advocate when a volunteer is "not able to handle it"; she had not observed any visitations between the mother and M.L.H.; the mother would "need to help" with M.L.H.; she does not believe the mother would be able to parent M.L.H. without assistance; the mother "has some problems with following directions without some help"; when in-home parenting services *939 were provided, the mother's ability to parent improved; she cannot say whether continuing in-home services would help the mother; she had visited the mother's home and it "was not totally put together, but it was clean"; she did not observe any safety hazards in the home; the home had an "alcove" with a baby bed and a side table; she "hopes" the mother's ability to parent would improve; she believes the mother "has not had the one-on-one time" that she needs to assist her in complying with her case plan; she had suggested to Hunt (the mother's case worker) that the mother might benefit from the use of a "dummy baby" to assist her with parenting; she recommended to Hunt that the mother might benefit from the use of "wrap around services or some type of services where she would get some help"; Hunt did not follow through with her suggestions; she has not observed the interactions between Hunt and the mother; she believed the mother had a "very difficult time getting in touch with her worker"; she had appealed to Hunt's supervisor to "help get some information for me"; and she has not seen "hardly anything" to suggest that DCFS had made any efforts to assist the mother with her case plan.
During cross-examination, McInnis testified as follows: her duties as a CASA supervisor included "guiding" and "working with" CASA volunteers; she had not observed any interactions between M.L.H. and the mother; the court ordered that CASA be appointed in December 2016; M.L.H. was placed "on a waiting list because we did not have an advocate for her"; normally, when a child is placed on a waiting list, a supervisor attends meetings until an advocate is assigned; she did not attend any meetings until M.L.H. was removed from the waiting list; she attended one family team meeting; she has visited the mother "about twice or three times" at her home; the mother has "some limited intelligence" and she needs "a lot of one on one" parenting assistance; she believes the mother can be taught how to care for M.L.H. "with a lot of training one on one"; wrap around services offer a range of services, including assisting with appointments, helping with the child and providing household assistance; she did not visit the home of the foster parents but one of the advocates did so; and she had not attended any of M.L.H.'s medical appointments. Nevertheless, McInnis opined that the mother's parental rights should not be terminated at this point because the mother has "not had enough time with her child. She's not had enough time with other services." McInnis admitted that she was unable to provide an opinion regarding whether the mother could successfully parent M.L.H. However, she expressed her reservations about not allowing the mother "to parent her child" and stated that she had "big problems with not pursuing a relative placement[.]" Further, McInnis testified that the mother loves M.L.H. and is willing to do whatever she has to do to care for her. However, she admitted that the mother had difficulty remembering appointments and reading prescriptions to ascertain the proper doses for medications.
Dr. James Pinkston, who performed a mental health evaluation of the mother, was accepted as an expert in clinical neuropsychology. He testified as follows: he evaluated the mother on April 25, 2016; he was unable to use standard tests on the mother because those tests required a reading level of at least fourth grade; the mother's cognitive and reading level was "restrictive"; testing revealed that the mother had a "very low" to moderate intellectual disability (also known as mental retardation ); the average IQ with regard to parenting a child is 100; the mother's parenting IQ was 52; DSM testing revealed *940 that the mother requires extensive support and supervision "in almost all areas of [her] life"; the mother has the capacity to love and comfort M.L.H. on an intermittent basis but she does not have the ability to parent a child; the mother requires constant assistance to care for M.L.H.; the person assisting the mother "has to be one hundred percent responsible for the care of [M.L.H.]"; parenting with 24-hour-a-day assistance does not constitute "parenting"; it would not be useful to demonstrate parenting to the mother by using a "dummy doll"; the mother lacks the ability to reason; the mother has a "really, really, really bad ability to learn and obtain new information"; the mother "has a hard time learning, understanding, generalizing information and behaviors"; the mother "will not be able to learn[,] retain, and apply information"; the mother's intellectual disability is congenital and will never improve; the mother's confidence in herself fuels her belief that "she can do far more than she can"; the mother has markedly impaired judgment, insight and awareness of her limitations and deficits; the mother self-reported that she had ADHD, bipolar disorder and schizophrenia, but she had a poor understanding of what the diagnoses meant; the mother is able to learn simple things but she lacks the cognitive ability to benefit from training or education with regard to parenting a child; the mother "is not capable of independently parenting a child"; the mother is "not capable [of] being a secondary or partial caregiver"; the responsibility of M.L.H.'s well-being "cannot be left up to [the mother] in any portion"; and M.L.H. would be placed "at pronounced risk of neglect or harm" if she is returned to the mother's custody.
On cross-examination, Dr. Pinkston admitted that he had never seen the mother interact with M.L.H. He also admitted that some parents with intellectual disabilities have the ability to parent a child. However, he stated as follows: "I don't believe [the mother] can be held responsible for the child's behavior to any reasonable about of time"; the mother might "be able to watch a child who isn't being difficult or provide some level of assistance, but she can't be wholly responsible for that"; the tests he performed indicate that the mother has "a substantial level of risk of difficulty, confusion, poor reasoning, and judgment and understanding"; he does not believe the mother would "benefit from any real education in a meaningful way" in parenting; it is possible to "try specialized [services], but I don't see that it would be fruitful"; and the mother "is not suitable as a parent for any child."
It is undisputed that at least one year has elapsed since M.L.H. was removed from the custody of her mother pursuant to a court order. The evidence also established that the mother has failed to substantially comply with various aspects of the case plan and that there was no reasonable expectation of significant improvement in the mother's condition or conduct in the near future.
The evidence of record established that the mother loves M.L.H. and she has expressed a desire to retain and maintain custody of her. However, based upon Dr. Pinkson's opinion and the mother's established pattern of conduct, the evidence also shows that the mother's intellectual disability has rendered her incapable of exercising parental responsibilities, without exposing M.L.H. to a substantial risk of serious harm. Dr. Pinkston provided uncontroverted testimony that the mother lacks the cognitive ability to independently comply with her case plan. He testified that the mother requires extensive support and supervision "in almost all areas of [her] life" and that she would require constant assistance to care for M.L.H. He *941 also stated that the mother lacks the ability to reason in a parental capacity and that her judgment is markedly impaired. Dr. Pinkston opined that the mother "is not capable of independently parenting a child," nor is she capable of "being a secondary or partial caregiver" to a child.
The record reveals that M.L.H. was placed in DCFS custody because she was not receiving adequate nutrition, she was not being kept clean and her medical needs were not being properly addressed. This record clearly demonstrates that the mother lacks the intellectual ability and insight required to independently care for a child. A key factor in this case is the mother's lack of understanding of basic child care, i.e. , adequately feeding the child, keeping the child clean, taking the child to medical appointments and administering medication to the child. Despite assistance from DCFS, the mother's actions revealed that she did not understand the need for proper nutrition for her child. Further, the mother's testimony revealed that she does not understand why M.L.H. was removed from her custody.
Moreover, the mother does not have an adequate support system to assist her. Her boyfriend testified that he is willing to assist her in caring for M.L.H. However, he is unable to provide the 24-hour-a-day assistance that she would require. Further, the mother's father testified that he would be willing to assist her. Yet, from this record, it is unclear what type of assistance he would be able to supply. He admitted that he did not have his own housing; he lived with his son's ex-wife. He also admitted that he was unable to visit the mother frequently because he did not have transportation to do so. Additionally, the mother's sister testified that she would be willing to assist and/or take custody of M.L.H. However, her testimony established that she does not have housing of her own: she, her boyfriend, and her three children live in the state of Texas in a home with her mother and stepfather. Furthermore, she testified that she has "bipolar one, two, and three" and she admitted that she has had her own issues with DCFS stemming from allegations of neglect with regard to two of her children.
The mother's living conditions are also a cause for concern. The mother and her boyfriend testified that they lived together in a home that he is in the process of buying. However, according to the report submitted by Redding, the mother reported that she was in an abusive relationship with her boyfriend and that, at some point, she had moved out of his home.
Consequently, we affirm the finding of the juvenile court. We agree with the court the state has proven, by clear and convincing evidence, that the mother had not substantially complied with her case plan, she is incapable of parenting the minor child, and there is no reasonable expectation that she will significantly improve her condition in the near future.
Once a ground for termination is established, the trial court may terminate parental rights if termination is in the best interest of the child. La. Ch.C. art. 1037(B) ; State in Interest of MTS, supra ; State in Interest of J.M.L., supra. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his or her physical, emotional and mental health needs and adequate rearing, by providing an expeditious judicial process for terminating all parental rights and responsibilities and achieving permanency and stability for the child. State in the Interest of MTS, supra ; State in the Interest of B.J. , 48,857 (La. App. 2 Cir. 1/15/14), 135 So.3d 777.
*942 Children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope for reuniting them with their families, runs afoul of the state and federal mandates to further the best interest of the child. State ex rel. J.M. , 2002-2089 (La. 1/28/03), 837 So.2d 1247 ; State in the Interest of MTS, supra.
This is a sad case. M.L.H. is now two years old and she has been in the custody of DCFS virtually all of her short life. As noted above, the evidence established that the mother lacks the intellectual and cognitive capacity to provide adequate care for the physical, emotional and mental health needs of M.L.H. Despite being provided with a simplified case plan, in-home assistance and parenting classes, the mother has not demonstrated the ability to parent and meet the essential needs of M.L.H. There is no evidence that her ability to care for M.L.H. has improved since DCFS became involved in this case over two years ago. In fact, Dr. Pinkston testified that the mother's condition and behavior will not improve in the future. The child has resided in the same placement for approximately two years and her foster family has expressed a desire to continue to care for her indefinitely. Most notably, Dr. Pinkston testified that M.L.H. would be placed "at pronounced risk of neglect or harm" if she is returned to the mother's custody. He further opined that, due to the mother's significant deficits, she "is not suitable as a parent for any child." Accordingly, we find that the juvenile court did not err in finding that the best interest of the M.L.H. will be served by terminating the mother's parental rights and certifying this child for adoption.
CONCLUSION
For the reasons set forth herein, we affirm the judgment of the juvenile court, terminating the parental rights of the mother. Costs of the appeal are assessed to the mother.
AFFIRMED.

M.L.H. was born HIV-negative. However, she was placed on medication to prevent her from becoming HIV-positive.

Initially, the mother identified M.D.W. as the biological father. However, DNA testing excluded him as the father. Several months prior to the hearing, the mother identified A.L.P. as the child's biological father. A.L.P. was eventually located but he refused to submit to a paternity test. Thereafter, the trial court ordered him to submit to a DNA paternity test; however, the test had not been conducted at the time of this proceeding.

A.L.P., John Doe and/or any unknown father of the child did not appeal. Therefore, the judgment terminating their parental rights is final and will not be addressed in this opinion.

Redding described incidents wherein the mother admitted that she often engaged in sexual intercourse with random strangers she met on the street. Further, Redding reported that the mother admitted that her live-in boyfriend was physically abusive and that the mother understood that living in an abusive home would not be good for M.L.H.

On redirect examination, the mother explained that her father had a DCFS case worker "because my momma made up some lies wasn't [sic] even true." She testified that she and her siblings were placed in DCFS custody for "just about a year and a half."

Additionally, when asked what she had learned from parenting classes, the mother stated, "I learned bad places and bad things, all kinds of stuff ... [b]ad people with a history and you kind of tell when they're bad, like been to jail and stuff like that. All type[s] of stuff."

The foster mother later testified that M.L.H. had an ongoing issue with chronic ear infections. By the time of the trial, she stated that M.L.H. had undergone an adenoidectomy and was "on [her] second set of tubes" in her ears.

In some portions of the record, her name is incorrectly spelled, "Francis McGinnis."